**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**CASE NO. 16-20595-CR-GAYLES**

**UNITED STATES OF AMERICA**

**vs.**

**JACK KACHKAR,**

**Defendant.**
________________________________/

**GOVERNMENT'S MOTION FOR PRE-TRIAL DETENTION AND SUPPORTING MEMORANDUM**

The defendant, Jack Kachkar, faces a thirty-year prison sentence for masterminding a $120 million bank fraud that caused the collapse of Westernbank, once the second largest bank in Puerto Rico. The defendant embezzled over $34 million from this fraud. Much of this money remains outside the United States and unaccounted for. Moreover, the defendant is not a United States citizen and has extensive travel to Libya and Russia—both countries without extradition treaties.

Notwithstanding the above, on October 5, 2016, Magistrate Judge Torres ordered the defendant's conditional release on a $1 million corporate surety bond and a $1 million personal surety bond. The United States believes that it is more likely than not that the defendant would forfeit this corporate surety bond and flee the United States. The government submits that the only way the Court can assure the defendant's presence at trial is to detain him. As set forth in more detail below, the government requests that the Court revoke the Magistrate Judge's bond and detain the defendant pending trial pursuant to 18 U.S.C. § 3145(a).

## I. Background

### A. The Indictment

On August 4, 2016, a grand jury in South Florida returned an indictment charging the defendant with eight counts of wire fraud affecting a financial institution (18 U.S.C. § 1343). These counts each carry a maximum 30-year sentence.

### B. Procedural History

On September 29, 2016, the United States arrested the defendant at Miami International Airport. On October 5, 2016, Magistrate Judge Torres held a pre-trial detention hearing on this matter.[1] Judge Torres agreed that the defendant posed a risk of flight, but stated that a $1 million corporate surety bond could mitigate this risk. At the hearing, Judge Torres stated that he would not lower the bond and that the defendant would remain in custody if he could not satisfy this $1 million bond.

### C. Relevant Legal Principles

The United States may appeal a bond determination of the magistrate court to the district court having jurisdiction of the case. 18 U.S.C. § 3145(a)(1). A district court's review of the magistrate judge's decision is *de novo*—requiring the court to exercise independent consideration of the facts before it. United States v. King, 849 F.2d 485, 489-90 (11th Cir. 1988). The district court has "substantial latitude in determining whether pretrial detention is appropriate." United States v. Clum, 492 Fed. App'x 81, 84 (11th Cir. Oct. 14, 2012). The Bail Reform Act empowers the Court to detain a defendant pending trial upon a finding that the defendant is a risk of flight. See 18 U.S.C. § 3142(e)(1). A preponderance of the evidence standard applies to the

---

[1] The United States has ordered a transcript of the detention hearing.

determination of whether a defendant poses a risk of flight. See 18 U.S.C. § 3142(f); United States v. Quartermaine, 913 F.2d 910, 917 (11th Cir. 1990).

The Bail Reform Act lists the following factors to consider in determining whether to impose detention in a case involving risk of flight: (1) the nature and circumstances of the offense charged; (2) the weight of the evidence against the person; and (3) the history and characteristics of the person. 18 U.S.C. § 3142(g). These factors here strongly weigh in favor of detention.

## II. Nature and Circumstances of the Offense / Weight of the Evidence

### A. Background

The indictment relates to loans provided by Westernbank Puerto Rico ("Westernbank") to Inyx, Inc. ("Inyx"), a publicly-traded pharmaceutical manufacturing company, from 2005 to 2007. The defendant was the CEO of Inyx during this period. Westernbank loaned money to Inyx in exchange for a security interest in Inyx's assets (primarily accounts receivable).

Inyx obtained funding from Westernbank for accounts receivable through the following process. Westernbank agreed to lend money based on Inyx's customer invoices arising from an "actual and bona fide" sale and delivery of goods or services to its customers. Upon review of customer invoices, Westernbank would determine the funds available to loan. Based on availability, Inyx would make periodic requests for funding and Westernbank would wire funds to Inyx's bank accounts in Miami. The loan agreements required Inyx to direct customer payments into a lock box account controlled by Westernbank.

By June 2007, Westernbank had lent approximately $142.5 million to Inyx with the majority of the loan secured by Inyx's accounts receivable. In July 2007, Westernbank declared the Inyx loan in default triggering a $120 million loss to Westernbank and the bank's collapse.

## B. The Scheme to Defraud

The defendant executed the scheme to defraud Westernbank in the following manner:

- *First*, the defendant caused Inyx employees to submit false and fraudulent customer invoices as collateral for funding from Westernbank.
- *Second*, the defendant caused Inyx employees to divert customer funds to Inyx's bank accounts rather than directing those funds to Westernbank's lock box account, as required by Westernbank's loan agreements.
- *Third*, to delay discovery of the fraud and induce additional lending, the defendant repeatedly lied to Westernbank executives about purported imminent full repayments of the Westernbank loan from an outside lender contingent on continued funding to Inyx from Westernbank.
- *Fourth*, the defendant lied and vastly overstated the value of assets pledged as a personal guarantee to obtain additional funds from Westernbank.

### i. The False Invoice Scheme

The defendant caused Inyx to provide false and fraudulent invoices as collateral for the Westernbank loans. In 2006, the defendant instructed Inyx Employee A and Inyx Employee B to generate invoices for work that Inyx might generate in the future (the "hypothetical invoices"). The defendant falsely and fraudulently represented to Inyx Employee A and Inyx Employee B that Westernbank had agreed to provide funding based on these hypothetical invoices.

Relying on instructions from the defendant, Inyx Employee A and Inyx Employee B generated tens of millions of dollars' worth of hypothetical invoices to numerous pharmaceutical companies. The companies referenced in these hypothetical invoices had not agreed to purchase the items set forth in the invoices and never received these invoices. Nonetheless, Inyx sent these invoices to Westernbank as valid and payable invoices. Based on these false and fraudulent invoices, Westernbank advanced tens of millions of dollars to Inyx via wire transfers to Inyx's bank accounts in Miami, Florida.

The United States has multiple witnesses—including Inyx Employee A and B—who will testify that the defendant directed them to generate these hypothetical invoices. The government will introduce Westernbank witnesses who will testify that they never agreed to fund hypothetical invoices and records showing loans by Westernbank based on these invoices.

**ii. The Cash Diversion Scheme**

In or around December 2006, the defendant instructed Inyx Employee A to direct certain customers of Inyx to make their invoice payments to Inyx's bank accounts. Inyx had previously assigned the collection rights for those invoice payments to Westernbank and directed the customers to remit payment to the Westernbank lock box account. The defendant falsely and fraudulently represented to Inyx Employee A that Westernbank had agreed to the diversion of funds to Inyx accounts. Based on instructions from the defendant, Inyx Employee A diverted millions of dollars' worth of invoice payments from Westernbank to Inyx.

The United States will introduce testimony from Inyx Employee A that the defendant directed him to divert cash payments to Inyx's bank accounts. The government will also introduce Westernbank witnesses who will testify that they never agreed to this cash diversion.

**iii. The Lulling Scheme**

As Westernbank executives raised concerns about loans to Inyx, the defendant lied and caused others to lie to Westernbank executives that an outside lender had agreed to provide funding to Inyx sufficient to pay off the full Westernbank loan contingent on Westernbank continuing to fund the Inyx loan. Based on these false and fraudulent representations, Westernbank continued to provide funding to Inyx and delayed certain audits of Inyx.

- **October 2006**: The defendant falsely and fraudulently represented that Credit Suisse had agreed to pay off the entire Westernbank loan. Relying on these false representations, Westernbank provided approximately $9.8 million in additional

funds to Inyx in that month.

- **November 2006**: The defendant falsely and fraudulently represented that Goldman Sachs had agreed to pay off the entire Westernbank loan. Relying on these false representations, Westernbank provided approximately $7.9 million in additional funds to Inyx in that month.

- **February 2007**: The defendant caused a fraudulent and forged term sheet to be sent to Westernbank indicating that Pareto (a Norwegian financial institution) had agreed to provide funding sufficient to pay off the entire Westernbank loan.[2] One day later, relying on this false representation, Westernbank provided approximately $1.85 million in additional funding.

- **April 2007**: The defendant caused a purported agreement to be sent to Westernbank under which the son of Muammar Gaddafi had purportedly agreed to provide funding to pay off the entire Westernbank loan.

The United States has multiple witnesses who will testify that the defendant represented that a major bank had agreed to pay off Westernbank's loan and that these representations were critical to Westernbank's continued funding of Inyx. The government will introduce the false term sheet from Pareto and testimony from Credit Suisse, Goldman Sachs, and Pareto that the representations by defendant above were false and fraudulent.

**iv. Overstated Assets**

In or around May 2007, the defendant met with senior Westernbank executives regarding the Inyx loan about outstanding accounts receivable. The defendant falsely and fraudulently represented (1) that over $80 million in outstanding Inyx customer accounts receivable was valid collateral and would be repaid; (2) that he had a copper mine worth $1 billion pledged that could fill the collateral gap; and (3) that he had an outside lender that would provide funding to pay off the loan by the end of the month. In June 2007, Westernbank provided additional financing based

---

2 Pareto has confirmed this was a forged letter. It had the wrong Pareto logo, it had a signature from a person not employed by Pareto, and it listed a phone number not associated with Pareto.

on these false and fraudulent representations. Shortly thereafter, Westernbank determined that the copper mine actually had a value that was a fraction of what defendant represented. Westernbank subsequently declared the Inyx loan in default.

The government will introduce witnesses from Westernbank who will testify that the defendant made the above misrepresentations. The government will also introduce a fraudulently altered mine valuation spreadsheet sent to Westernbank to support the $1 billion valuation. See Exhibit 1 – Kachkar Altered Copper Mine Valuation.[3]

**C. The Defendant's Theft of Funds**

From 2005 through 2007, the defendant embezzled and misappropriated monies sent by Westernbank by transferring approximately $25 million in funds from the Inyx accounts to the defendant's personal accounts[4] and by transferring approximately $9.6 million in funds from the Inyx account to a bank account in the name of the defendant's friend.

The government will introduce evidence that defendant controlled the Inyx bank accounts and pilfered these accounts to live an extremely extravagant lifestyle. The government will further introduce evidence that the defendant lied to Inyx's CFO and claimed that the $9.6 million had been sent to a money manager in Dubai when it had actually been sent to the defendant's

---

[3] The defendant provided a forged and altered copper mine valuation spreadsheet to Westernbank. The original version had been fraudulently manipulated by the defendant to justify a $1 billion valuation. Exhibit 1 includes both the unaltered and altered versions. The defendant invested less than a couple million dollars into this copper mine venture (primarily from stolen Westernbank funds).

[4] These funds were in addition to his yearly salary of several hundred thousand dollars a year.

friend to purchase Inyx shares and pump up the stock price.

## III. The Defendant's History and Characteristics

There are numerous factors in the defendant's history and characteristics that make it highly unlikely that any combination of conditions would reasonably assure his presence at future proceedings.

***First***, the defendant is not a United States citizen. He is a Syrian-born, Canadian citizen. The defendant lives in Canada and occasionally travels to the United States.[5] He has stronger ties to Canada, including his wife, multiple siblings, and multiple properties and bank accounts.

***Second***, the defendant has extensive travel and ties to foreign countries without extradition treaties. The defendant has significant international travel, including numerous trips to Libya and Russia over the past ten years (See Exhibit 2 – Kachkar Canadian Passport).[6] In addition, the defendant's wife was born in Russia and the defendant maintains bank accounts in Russia. See United States v. Pon, 2014 WL 3340584, at *4-5 (M.D. Fl. May 29, 2014) (detaining dual U.S/Chinese citizen accused of health-care fraud because, despite 22 years of U.S. residency, he had "the know-how to flee to China and is very familiar with that country," which "does not have an extradition treaty with the United States").

***Third***, the defendant has committed crimes abroad. In 2007, the defendant submitted a

---

5 Magistrate Judge Torres suggested that the defendant might sign an extradition waiver intended to apply prospectively to extradition proceedings in Canada. Such a waiver is not likely enforceable. See In Re Extradition of Pelletier, 09-22416-MJ-AMS, 2009 WL 3837660, *3-4 (S.D. Fla. Nov. 16, 2009) (noting that "it appears that such a waiver would have no effect in a Canadian court"); see also United States. V. Tan Ong, 762 F. Supp. 2d 1353, 1359 (N.D. Ga. 2010) (same).

6 Notably, the defendant failed to report these trips to Libya and Russia to pretrial services. The defendant also failed to report over $140 million in outstanding civil judgments against him to pretrial services.

false and forged €81 million line of credit from Countrywide Home Finance in connection with the attempted purchase of the French premier league soccer team Marseille. See Exhibit 3 – Countrywide Letter of Credit and Affidavit of Forgery. The French prosecuted the defendant and he received a suspended prison sentence for this fraud in 2011.

***Fourth***, the defendant has committed additional crimes in the United States. Specifically, the defendant engaged in a $3 million check-kiting scheme against Mellon Bank in 2007 and sent over $1 million in proceeds to Canada. In addition, the defendant filed fraudulent tax returns in 2006 and 2007 and received tax refunds of approximately $89,000 in both years as a result.

***Fifth***, the defendant has substantial unaccounted-for assets outside the United States. This case involved the theft of over $34 million in fraudulent funds. In particular, the government has specific knowledge of over $7.4 million in funds in Canada resulting from this fraud and the related Mellon Bank fraud. Following the detention hearing, the United States requested that the defense provide information related to these Canadian assets.[7] The defense has not provided any information relating to these assets since that request nor expressed a willingness to provide this information. A $1 million bond is not a sufficient deterrent to flight if the defendant could simply flee and then transfer that amount to the person posting the bond. See United States v. Magnifico, 2008 WL 276033, *2 (M.D. Fla. Jan. 31, 2008) (reversing magistrate judge's $500K cash bond, ordering detention of Canadian citizen defendant, and finding it an "event of speculation" that the "loss of several hundred thousand dollars will deter a person of unknown financial means from fleeing the jurisdiction to avoid imprisonment for a term of years").

---

[7] On October 13, 2014, the United States sent an e-mail to defendant's counsel requesting an accounting associated with these funds. The United States has been awaiting this information via a request for assistance from Canada for many months. In particular, the United States requested that the defense provide electronic access to these Canadian bank accounts to trace these funds.

***Finally***, the defendant is 53-years old and faces a likely guideline range after trial of 324 to 405 months. Such a severe sentence provides a massive incentive for the defendant to flee the United States and weighs heavily in favor of detention under the circumstances. See United States v. Burke, 13-20616-CR-COHN, 2013 WL 5194138, *1 (S.D. Fla. Sept. 17, 2013) (upholding detention on 50-year old defendant facing similar sentencing range since defendant had a "great incentive to flee").

## CONCLUSION

For the foregoing reasons, the United States respectfully requests that the Court detain the defendant pending trial.

Respectfully submitted,

WIFREDO A. FERRER
UNITED STATES ATTORNEY

By: /s/ Michael N. Berger
Michael N. Berger
Assistant United States Attorney
Court No. A5501557
99 Northeast 4th Street
Miami, Florida 33132
(305) 961-9445
(305) 536-4699 (fax)
Michael.Berger2@usdoj.gov

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a true and correct copy of the foregoing was electronically filed with the Court's CM/ECF system on November 1, 2016.

By: /s/ Michael N. Berger
Assistant United States Attorney