**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO. 16-20595-CR-GAYLES (GRAHAM)/OTAZO-REYES**

UNITED STATES OF AMERICA,

v.

JACK KACHKAR,

      Defendant.

_____/

**REPORT AND RECOMMENDATION RE: MOTION TO SUPPRESS**

THIS CAUSE came before the Court upon Defendant Jack Kachkar's ("Defendant" or "Kachkar") Motion to Suppress Evidence and Request for Evidentiary Hearing (hereafter, "Motion to Suppress") [D.E. 254]. This matter was referred to the undersigned by the Honorable Darrin P. Gayles, United States District Judge, pursuant to Title 28, United States Code, Section 636, for report and recommendation [D.E. 258]. The undersigned *sua sponte* held an evidentiary hearing on this matter on October 1, 2018 [D.E. 308].[1] Thereafter, the parties submitted post-hearing memoranda [D.E. 329, 336, 345 (under seal), 415 (under seal) and 432 (under seal)]. Upon a review of the evidentiary record, the arguments of counsel and the applicable law, the undersigned respectfully recommends that Defendant's Motion to Suppress be DENIED.

**THE CHARGES AGAINST KACHKAR**

On April 20, 2017, the grand jury returned a Second Superseding Indictment (hereafter, "Indictment") against Kachkar, charging him with the following offenses:

Counts 1-8:    Wire Fraud Affecting a Financial Institution, from 2005 to June 2007, in violation of 18 U.S.C. § 1343.

---

[1] Thus, the request for evidentiary hearing prong of the Motion to Suppress is DENIED AS MOOT.

Count 9:      Wire Fraud Affecting a Financial Institution, from October 1, 2007 to October 18, 2007, in violation of 18 U.S.C. § 1343.

Count 10:     Wire Fraud, from April 2011 to January 2016, in violation of 18 U.S.C. § 1343.

See Indictment [D.E. 113].

The Indictment alleges that, from 2003 to 2007, Kachkar served as Chief Executive Officer ("CEO") of Inyx, Inc. ("Inyx"), a pharmaceutical manufacturing company with corporate offices in Miami, Florida. Id. at 1. Inyx also conducted business through wholly owned subsidiaries (hereafter, "Inyx Companies") operating in various locations, including Puerto Rico. Id. In 2005, Westernbank Puerto Rico ("Westernbank") extended asset based loans to Inyx Companies, with the latter's accounts receivables serving as security. Id. at 3. By June 2007, the total amount loaned by Westernbank to Inyx Companies reached $142.5 million. Id. at 6. At that time, Westernbank declared the Inyx loans in default and, after suffering losses exceeding $100 million, the bank ultimately collapsed. Id.

In Counts 1 through 8, the Indictment alleges a wire fraud scheme against Kachkar consisting of: submitting false customer invoices to the bank as collateral; causing customers to divert their payments to Inyx Companies rather than the bank's lockbox; misrepresenting to Westernbank executives the status of loan repayments and the value of the pledged assets; and misappropriating and embezzling the fraud proceeds for his personal use. Id. at 7. Each of the eight counts is associated with a specific wire transfer. Id. at 12-13.

In Count 9, the Indictment alleges that, in October 2007, Kachkar deposited a worthless $3 million check into a Mellon Bank corporate account he controlled, which resulted in the wiring of a provisional $1 million credit to that account and the subsequent wire transfer of those funds to Kachkar's personal account in Canada. Id. at 13-14.

In Count 10, the Indictment alleges that Kachkar falsely represented to an individual named D.B. that he had received a substantial money judgment from the Federal Deposit Insurance Corporation ("FDIC") and that he needed funds to pay associated expenses prior to having the judgment funds released, which funds would be used to repay D.B. Id. at 15. As a result, D.B. made $1.7 million worth of wire transfers to Kachkar during the period from 2011 to 2016, including a $262,000 wire transfer from D.B.'s bank account in Switzerland to an account controlled by Kachkar in Miami, Florida. Id. at 16-17.

## THE MOTION TO SUPPRESS

At issue in Kachkar's Motion to Suppress are documents provided by the Canadian government to the U.S. Department of Justice ("DOJ") pursuant to a request under the Mutual Assistance Treaty ("MLAT") between the United States and Canada (hereafter "MLAT Request"). Defendant argues that the documents were obtained from Canada in violation of the Fourth Amendment. In the alternative, Defendant argues that the government conducted impermissible warrantless searches of the documents after they were sent from Canada to the United States.

Defendant next argues that the government improperly viewed documents that he claims are privileged. In his Sealed Supplemental Memorandum to his Motion to Suppress (DE 254) (hereafter, "Supplemental Post-Hearing Brief") [D.E. 415], Defendant seeks the following remedies for this alleged invasion of his attorney-client privilege: suppression of the evidence obtained through the MLAT Request, dismissal of the Indictment; dismissal of the Counts that he claims are based on the improperly viewed documents; or disqualification of the trial team.

## APPLICABLE LAW

### 1.    *Fourth Amendment*

The Fourth Amendment protects "the people" from "unreasonable searches and seizures." U.S. Const. amend. IV. "The Fourth Amendment is generally inapplicable to actions carried out by foreign officials in their own countries enforcing their own laws, even if American officials are present and cooperate in some degree." United States v. Behety, 32 F.3d 503, 510 (11th Cir. 1994). One exception to this rule applies "if American law enforcement officials substantially participated in the search or if the foreign officials conducting the search were actually acting as agents for their American counterparts." Id. This is known as the "joint venture doctrine" and "it requires that the participation of federal agents be so substantial so as to convert the search into a joint venture." Id. at 511. The second exception to the U.S. territorial limitation on the Fourth Amendment's application arises "if the conduct of the foreign officials during the search and seizure shocks the judicial conscience." Id. at 510.

Under the long established exclusionary rule, "evidence seized during an unlawful search [can] not constitute proof against the victim of the search." Wong Sun v. United States, 371 U.S. 471, 484 (1963) (citing Weeks v. United States, 232 U.S. 383 (1914)). "The exclusionary prohibition extends as well to the indirect as the direct products of such invasions." Id. at 484-85 (citing Silverthorne Lumber Co. v. United States, 251 U.S. 385 (1920)).

### 2.    *Attorney-client privilege*

Based on his claim that the government reviewed documents that he contends are privileged, Defendant seeks dismissal of the Indictment (in whole or in part), disqualification of the prosecution team, or suppression of evidence. In United States v. Ofshe, 817 F.2d 1508 (11th Cir. 1987), the Eleventh Circuit analyzed a motion to dismiss an indictment based on

4

government misconduct under both the Sixth and Fifth Amendments. Id. at 1515-16. With regard to violations of a defendant's right to counsel under the Sixth Amendment, the Eleventh Circuit noted that, pursuant to Supreme Court precedent, dismissal is "plainly inappropriate" if there is no "demonstrable prejudice." Id. at 1515 (citing United States v. Morrison, 449 U.S. 361 (1981)). With regard to violations of due process rights under the Fifth Amendment, the Eleventh Circuit stated that, "[t]o constitute a constitutional violation the law enforcement technique must be so outrageous that it is fundamentally unfair and 'shocking to the universal sense of justice mandated by the Due Process Clause of the Fifth Amendment.'" Ofshe, 817 F.2d at 1516 (citing United States v. Russell, 411 U.S. 423, 432 (1973)). See also United States v. Merino, 595 F.2d 1016, 1018 (5th Cir. 1979) ("[I]n the case of even the most egregious prosecutorial misconduct . . . the dismissal of an indictment in such a case must depend upon a showing of actual prejudice to the accused."). In United States v. Pabian, 704 F.2d 1533 (11th Cir. 1983), the Eleventh Circuit noted that "prejudice must be shown when dismissal is based on violations of the Constitution." Id. at 1540. In Bank of Nova Scotia v. United States, 487 U.S. 250 (1988), the Supreme Court stated that "a district court exceeds its powers in dismissing an indictment for prosecutorial misconduct not prejudicial to the defendant." Id. at 255. See also United States v. Campagnuolo, 592 F.2d 852, 865 (5th Cir. 1979) ("The supervisory powers of a district judge, however, allow him to impose the extreme sanction of dismissal of an indictment with prejudice only in extraordinary situations. . . . For this reason, we have held that a district judge may dismiss an indictment with prejudice because of misconduct by the government only if that misconduct actually prejudiced the defendant."); United States v. Deluca, No. 6:11-cr-221-Orl-28KRS, 2014 WL 3341345, at *9 (M.D. Fla. July 8, 2014) ("Dismissal under a court's supervisory powers, however, also requires prejudice.").

Defendant bears the same burden of showing misconduct and prejudice with regard to his request for disqualification of the prosecution team, which is similarly based on his claim of government violations of the attorney client privilege.  See United States v. Walker, 243 F. App'x 621, 622-24 (2d Cir. 2007) (upholding the district court's denial of a motion to disqualify, reasoning that there was no egregious misconduct on the part of prosecutors who had limited exposure to a handful of privileged documents and any theory of prejudice by the defendant was far too attenuated); United States v. Stewart, 294 F. Supp. 2d 490, 494 (S.D.N.Y. 2003) (denying a motion to disqualify the prosecutor for inadvertent review of a privileged email, where the motion was only supported by "vague and conclusory allegations of the harm").

Even when the requirements of misconduct and prejudice are met, courts may choose suppression of evidence rather that dismissal or disqualification.  See United States v. Melvin, 650 F.2d 641, 644 (5th Cir. Unit B 1981) (remanding the case for further findings of fact on the question of prejudice and, if prejudice was found, for consideration of some remedy short of dismissal, such as suppression); Deluca, 2014 WL 3341345, at *8 ("When a defendant has shown prejudice, a court must determine if a less drastic remedy, such as suppression of the evidence in question, can sufficiently address the constitutional violation."); United States v. Kaufman, No. CRIM.A.04-40141-01, CRIM.A.04-40141-02, 2005 WL 2087759, at *4 (D. Kan. Aug. 25, 2005) ("The Tenth Circuit has almost categorically rejected dismissal of the indictment as a proper remedy in federal prosecutions involving breach of the attorney-client privilege."); Stewart, 294 F. Supp. 2d at 494 (noting that suppression rather than disqualification is the proper remedy for inadvertent disclosure of work product).

**FINDINGS OF FACT**

I.   **Testimonial and documentary evidence**

     1.      The following witnesses testified at the October 1, 2018 evidentiary hearing: FDIC Office of Inspector General ("FDIC-OIG") Agent Gary Sherrill ("Agent Sherrill"); and FDIC-OIG Agent Michael Eaton ("Agent Eaton"). The undersigned finds the testimony of Agent Sherrill and Agent Eaton to be credible.

     2.      The following documents were admitted into evidence: Government's Exhibits 1-6; and Defendant's Exhibits A-R, S (under seal), T-Z, AA (under seal).

II.   **Facts**

  A. *Agent Sherrill*

     3.      In Spring 2013, Agent Sherrill traveled to Toronto, Canada to assist the Toronto Police Services unit in conducting a cursory review of documents that had been obtained by the Canadian Government pursuant to the MLAT request, dated March 23, 2010. See Gov't Ex. 1.

     4.      The MLAT Request sought the records of Inyx and its subsidiaries that dealt with the loans from Westernbank.

     5.      Specifically, the MLAT Request indicated that Ernst & Young had custody of the records being sought because Ernst & Young had been appointed as the Receiver for Inyx Canada in an action before the Superior Court of Justice in Ontario, Canada. Id. at 5.

     6.      A gathering order was issued by the Superior Court of Justice in Toronto, Canada as a result of the MLAT Request (hereafter, "Gathering Order"). See Gov't Ex. 2.

     7.      Detective Constable Soon (Sinbad) Lum of the Toronto Police Service ("Detective Lum") executed the Gathering Order. Id.

     8.      The Gathering Order instructed Detective Lum to obtain "records relating to Inyx

Canada between January 1, 2005 and December 31, 2007, including:" purchase orders; shipping orders; customer accounts; financial reports; sales records between Inyx Canada and other Inyx companies; and debt and banking records for Inyx companies. Id. at 2.

9.      The Gathering Order specifically excluded records claimed to be "solicitor-client privileged." Id. at 2-3. Kachkar was to receive three-days-notice before the gathering of records so he could review, identify and segregate those for which he claimed privilege, and those records were to be held by the Toronto Police Service pending further disposition. Id. at 3.

10.      The Gathering Order authorized representatives of the United States to be present during the gathering of records "for assistance purposes only." Id.

11.      At some point, Detective Lum engaged in communications with FDIC-OIG to work out the logistics of how that office might assist the Canadian authorities in determining which records were subject to the Gathering Order.

12.      Agent Sherrill participated in assembling a team of seven or eight FDIC-OIG agents to travel to Canada and assist Detective Lum in looking through approximately 400 boxes of documents.

13.      Detective Lum provided the instructions on what process to follow at a briefing in the parking lot of the Iron Mountain facility where the documents were located. The instructions were to do a cursory review of the 400-odd boxes of records to determine whether they fell within the scope of the Gathering Order, which meant records relating to Inyx or its companies between 2005 and 2007.

14.      The FDIC-OIG agents worked at a small office at the Iron Mountain facility, where pallets of boxes were brought for their review.

15.      Agent Sherrill conducted his review as follows: after opening a box, he would

take out the binders or files, looking for the word "Inyx" and if he found it he would look for the date. If the date fell within the 2005-2007 time period, he would tell Detective Lum that the box fell within the scope of the Gathering Order. Once he found the word "Inyx" and the date frame in a box, he did not continue reviewing that box.

16.     No notes, pictures or copies were made of the documents.

17.     After each box was reviewed, it was placed in a pallet designated as "responsive" or "non-responsive" as appropriate. There was also a third pallet for records that were marked "privileged."

18.     If the FDIC-OIG agents found envelopes or folders marked privileged, the agents did not open them and simply advised Detective Lum that the box contained privileged materials.

19.     Both Detective Lum and Kachkar were present during the review and the FDIC-OIG agents could not proceed in their absence.

20.     The entire review process took three to four days.

21.     Thereafter, an Order to Send Evidence to the United States of America ("Responsive" Materials) was issued by the Superior Court of Justice in Toronto, Canada (hereafter, "Sending Order"), which directed the transmission to the United States of 36 non-privileged boxes of materials. See Gov't Ex. 3.

22.     Another Order to Send Evidence to the United States was issued by the Superior Court of Justice in Toronto, Canada (hereafter, "Second Sending Order"). See Gov't Ex. 4. It references 40 boxes of materials as to which Kachkar asserted a claim of privilege and describes the process by which those privilege claims were addressed. Id.[2] The Court directed that boxes

---

[2]   According to Agent Sherrill, the Canadian Court "allowed the Crown counsel and Kachkar and/or his attorneys to try and reach an understanding on what documents were privileged and which ones were

of documents designated as privileged be made available for pickup by Kachkar, and that the remaining boxes of documents be transmitted to the United States. Id.

23.    Agent Sherrill explained the final records review process that took place in Canada as follows:

> It's my understanding from reading some of the records that after we had finished our work, that Mr. Kachkar was given a chance to review the records again and put the records into three piles basically. One pile of boxes that he agreed were within the scope and could be sent to us. It's my understanding that the boxes in that pile represent the boxes in the initial sending order. The two other piles, one containing boxes that he argued were beyond the scope of the gathering order and then the third pile of boxes over which he claimed privilege. And I think the last sending order resolved the issue with those boxes.

See 10/1/18 Transcript [D.E. 314 at 30]. By "those boxes" Agent Sherrill meant "the boxes that were in the piles marked privileged and the boxes in the pile that the Defendant argued were beyond the scope of the gathering order." Id. at 30-31.

24.    Kachkar sought leave to appeal the Second Sending Order, but only to the extent it included records that he argued were beyond the scope of the Gathering Order. See Gov't Ex. 5 at 10-11. The Court of Appeal for Ontario denied the motion for leave to appeal. Id. at 2.

25.    The government proffered a transcript of a hearing held by the Canadian judge presiding over the MLAT Request. See Gov't Ex. 6. At that hearing, Kachkar's counsel stated that "Dr. Kachkar reviewed each document in detail and included which were created or produced in preparation of litigation." Id. at 19.

26.    On cross-examination, Agent Sherrill was shown the "Second Report of the Interim Receiver" filed by Ernst & Young in the case of Westernbank Puerto Rico against Inyx Canada Inc. (hereafter "Receiver's Report"). See Def's Ex. A. Agent Sherrill agreed that the gist of the Receiver's Report was that a protocol for accessing documents in the Receiver's

---

not;" and, thereafter, an agreement was reached. See Transcript of October 1, 2018 Hearing (hereafter, "10/1/18 Transcript") [D.E. 314 at 28].

custody would be necessary to handle documents of non-parties to the litigation that were kept at the premises of Inyx Canada.

27.     Agent Sherrill was also shown an Order issued in the case of Westernbank Puerto Rico against Inyx Canada Inc. (hereafter, "Protocol Order").  See Def's Ex. B.  Agent Sherrill agreed that the Protocol Order stated, in pertinent part, that any document obtained by the Receiver must be kept confidential until released from the Protocol by court order.

28.     Agent Sherrill was also shown a document entitled "Catalogue Listing of Items Received by Ernst & Young Through Execution of Receivership Order (September 6, 7, 10, and 11, 2007)" (hereafter, "Catalogue").  See Def's Ex. C.  Agent Sherrill acknowledged that some of the items that appear at pages 106 and 107, as well as subsequent pages in the Catalogue have the notation "privileged."

29.     Agent      Sherrill      acknowledged      that,      around      February      2008, PricewaterhouseCoopers ("PwC") replaced Ernst & Young as Receiver (PwC hereafter, "Successor Receiver") in the case of Westernbank Puerto Rico against Inyx Canada Inc.

30.     Agent Sherrill also acknowledged that Ernst & Young had been appointed administrator in an Inyx United Kingdom ("Inyx UK") case and that an Ernst & Young employee by the name of Jonathan Middup ("Mr. Middup") had assisted in that case by conducting a forensic examination of Westernbank's loan agreements involving Inyx and its subsidiaries.

31.     After replacing Ernst & Young as Receiver, PwC had custody of the Receivership documents and stored them at the Iron Mountain facility, where Detective Lum had access to them and Agent Sherrill assisted in their review.

32.     At the time of the document review, Agent Sherrill knew that an MLAT had been submitted for records of Inyx from the Toronto Police headquarters.  However, he was not aware of the litigation that had taken place in Canada regarding the documents.  Nevertheless, Agent Sherrill was aware that Kachkar was making attorney-client privilege claims with regard to the documents at the time of the review.

33.     In November 2007, Gary H. Montilla-Brogan ("Attorney Montilla"), as counsel for Westernbank, requested that federal authorities in San Juan, Puerto Rico, namely the U.S. Attorney and the FBI Agent in Charge, conduct a criminal investigation regarding Inyx's relationship with Westernbank.  See Correspondence dated November 2, 2007, Def's Ex. D.  In his letter, Attorney Montilla set out what he believed to be Inyx's criminal scheme based on Mr. Middup's forensic examination.  Id.  Attorney Montilla offered to make Mr. Middup available to the federal authorities.  Id. at 13.

34.     Also in November 2007, Attorney Montilla sent an email to various individuals connected with Westernbank, informing them that the FBI was going to conduct the requested criminal investigation as a priority.  See E-mail chain dated November 7, 2007, Def's Ex. E.

35.     Also in November 2007, Attorney Montilla forwarded to the FBI's San Juan office a CD-ROM containing five tranches of documents, including transcripts of testimony by Mr. Middup and a Westernbank employee named Gabriel Montañez.  See Correspondence dated November 9, 2007, Def's Ex. F.

36.     Attorney Montilla also drafted a proposed MLAT request in January and early February 2008.  See MLAT Draft and Attorney Montilla's billing records, Def's Ex. G. According to Agent Sherrill, however, the first MLAT Request was not transmitted to Canada until Spring 2010.

37.     On September 22, 2008 Department of Homeland Security ("DHS") Special Agent Carlos F. Velez Torres reported that the final copy of an MLAT request to obtain documents from the Inyx office in Canada had been sent to DOJ in Washington, D.C. on September 19, 2008. See DHS Report of Investigation, Def's Ex. H.

38.     The MLAT Request was finally sent to Canada on March 23, 2010. See MLAT Request, Gov't Ex. 1.   This was a little over three years after Ernst & Young had taken possession of the documents. Agent Sherrill had no involvement in drafting the MLAT Request.

39.     After conducting his forensic examination of Inyx, Mr. Middup had prepared an affidavit supported by two binders of information that was filed in a civil RICO case against Inyx (hereafter, "Middup Affidavit").

40.     Agent Sherrill acknowledged that the criminal conduct description in the MLAT Request relied heavily on Mr. Middup's investigation, including details from the Middup Affidavit.

41.     In the course of the government's investigation of Inyx, the FBI interviewed Mr. Middup. See FBI 302, serialized on January 16, 2008, Def's Ex. I. The FBI 302 notes that Mr. Middup provided a copy of the Middup Affidavit and supporting documentation as part of his interview. Id. at 9.

42.     On April 20, 2010 the International Assistance Group for Canada's Minister of Justice approved the MLAT Request for business records. See Minister's Approval of Treaty Request, Def's Ex. J.

43.     On March 14, 2011, DOJ provided to Canadian authorities a revised description of the business records sought in the MLAT Request. See Supplemental Request for Assistance, Def's Ex. K.   The letter includes the following language: "Additionally, please allow U.S.

investigators to be present when the person or persons designated to execute the order reviews the over 400 boxes and dozens of hard drives.  The U.S. investigators will not remove any material from the premises, but their presence will assist in determining which material is relevant." Id. at 2.  When asked about this language, Agent Sherrill testified that, at the time of the document review, what he was told was that the Toronto Police Services had requested assistance.

44.    Agent Sherrill acknowledged that the process undertaken pursuant to the Gathering Order consisted of trying to determine, from the universe of documents consisting of 400 boxes and various hard drives, which were appropriate to send to the United States pursuant to the MLAT Request.

45.    Agent Sherrill was shown the following documents related to Canada's compliance with the MLAT Request: Order to Gather Evidence in Canada, Def's Ex. L; Order dated August 17, 2012, Def's Ex. M; and Order dated August 21, 2012, Def's Ex. N.  Agent Sherrill was also shown a letter from the Successor Receiver to "Parties Listed in Appendix 'A'," Def's Ex. O & P.  Agent Sherrill could not establish a connection between these documents and his ultimate trip to Canada but testified that he had been told by his supervising agent "that there were a lot of boxes and Toronto Police Services either could not, was not, would not take possession of all of these records and go through them.  And so [the Office of International Affairs] asked us if we would help with that process.  That's my understanding.  I don't know when [Detective Lum] got access to the records.  I don't know if he physically moved them or if the first time they were moved was when we went up there the following May." See 10/1/18 Transcript [D.E. 314 at 98-99].

46.    Agent Sherrill confirmed that, in addition to himself, the following FDIC-OIG

individuals comprised the team that traveled to Canada to assist Detective Lum: Special Agent in Charge Derek Evans; Special Agent Andrew Peterson; Special Agent Esteban Santana; Special Agent Michael S. Eaton; Special Agent Jonathan Heyden; and Special Agent Peter A. Caggiano. Some of these agents were in Canada only for a portion of the review time.

47.     Agent Sherrill reaffirmed that Detective Lum and Kachkar were present during the review.

48.     Agent Sherrill again described the office at the Iron Mountain where the review took place.  He also again described the briefing that took place in the parking lot of the facility before the review started.  According to Agent Sherrill, Detective Lum provided the following instructions:  "That [the agents] were there to assist him in making—trying to make sure that he got all the records that the MLAT asked for, but at the same time, not get records that were beyond the scope of the MLAT."  Id. at 105.

49.     Agent Sherrill did not recall a reference to privileged materials at the briefing.

50.     The issue of privileged materials first arose on the first day, since many of the boxes had envelopes in them marked privilege.  Detective Lum said that the agents could not look at privileged materials and tried to determine the best process forward.  Ultimately, it was decided that the records in each box would not be separated.  So, three pallets were constituted from the boxes: responsive; beyond scope; and privileged.

51.     Once the decision not to separate records in each box was made, Agent Sherrill deemed any box containing documents within the prescribed period with the name Inyx to be responsive and did not search that box further.

52.     Kachkar was present at all times that the agents were conducting the review.  At times he would be talking to Detective Lum about the gathering, and would say regarding a

document "that's privileged" or "that's beyond the scope." Id. at 109.

53.     Throughout the review process, Detective Lum was working with an inventory of the boxes, but Agent Sherrill did not see a final inventory of the boxes that were gathered. His recollection is that 89 or 90 boxes were deemed responsive, in addition to the boxes containing the hard drives. He did not recall how many boxes were on the privileged pallet.

54.     When the review was completed, the agents were told that the courts would decide what portion, some or all of the records that [the agents] believed were within the scope of the gathering order would be released" pursuant to the MLAT Request. Id. at 113.

55.     Agent Sherrill recalled that there were two productions of documents. The first production involved "36 boxes" of documents that "Defendant had agreed were within the scope of the gathering order and should be released." Id. at 116.[3] The second production, involving approximately 49 boxes, required Agent Sherrill and a prosecutor to travel to Canada to retrieve it. After the boxes were secured, they were sent to a contractor for scanning, and then they had to be returned to Canada.[4]

56.     After scanning of all the boxes was completed, an inventory of the boxes was prepared by various federal agencies acting cooperatively, with each agency being responsible for inventorying about a dozen boxes. Agent Sherrill's office prepared a topical inventory of 12 to 13 boxes, which was produced to Defendant. Agent Sherrill never saw any inventories performed by the other agencies.

57.     In Fall 2015, the documents received from Canada were placed in a Relativity database maintained by DOJ's fraud section and, thereafter, word term searches were used to pull up relevant material.

---

[3] Agent Sherrill could not provide any further details regarding the first production.
[4] Agent Sherrill was shown at this point a document marked as Defendant's Exhibit Q, which appears to have been amended by the Sending Order, marked as Government's Exhibit 3.

58.     On January 20, 2016, FDIC-OIG's forensic accountant transmitted to the prosecutor in this case DVDs containing the documents received from Canada.  See E-mail, Def's Ex. R.

59.     At this point in the proceedings, the undersigned admitted the following additional exhibits proffered by Defendant: documents received from Canada which Defendant claims are privileged, Def's Ex. S (under seal); documents provided in discovery which Defendant claims were inappropriately gathered in Canada and sent to the United States, Def's Exs. T, U, V; inventories of the various boxes of documents sent from Canada, Def's Ex. W; the MLAT Canada Act, Def's Ex. X; technical analysis of the U.S. MLAT, Def's Ex. Y; MLAT Treaty between the United States and Canada, Def's Ex. Z; transcripts of Agent Sherrill's grand jury testimony on August 4, 2016 and December 1, 2016, Def's Ex. AA (under seal).

60.     Thereafter, Agent Sherrill concluded his cross-examination testimony as follows. Agent Sherrill had no knowledge of any search warrant application in Canada or the United States covering the documents that were sent from Canada to the United States.

61.     The undersigned found Agent Sherrill's testimony to be direct, internally consistent and credible.

**B.  Agent Eaton**

62.     Agent Eaton was involved in the review of boxes in Canada in May 2013.

63.     Prior to engaging in the review of the boxes at the Iron Mountain facility in Canada, Agent Eaton received from Detective Lum "a brief review of what was allowed per the MLAT to be reviewed and what was to be set aside." See 10/1/18 Transcript [D.E. 314 at 129]. The instructions provided by Detective Lum were to look for financial records of a particular company during a particular timeframe, and, if there was anything privileged, not to look at it.

64.    Agent Eaton described the review process as follows.

> So generally, there was a room that had either just a desk on kind of either
> side or a long bench. We would go to the big pallet and just take the next
> box on the top. I believe agent or Officer Sinbad would let—record what
> box was being taken. We would place it on the credenza, shall we say, and
> lift the lid, go through it and yes, it says Inyx and it's 2005 and it's an
> invoice, then okay, we've got some relevant documents here. Came across
> anything that was in an envelope marked privileged, we knew that was
> going to go to the privilege stack.

Id. at 130.

65.    During the course of the review, Agent Eaton did not open any envelopes or folders that were marked privileged and did not observe any other agents do so.  He took no notes and made no copies of the documents.

66.    On cross-examination, Agent Eaton testified that he was not asked to write any reports of what he and the other agents had done in Canada during the gathering process.

67.    The undersigned found Agent Eaton's brief testimony to be credible and consistent with Agent Sherrill's testimony.

### C. Post-hearing evidence

68.    At the evidentiary hearing, Defendant submitted as Exhibit S a substantial number of documents that were sent to the United States pursuant to the MLAT Request, which he claims are privileged.  See Def's Ex. S (under seal).[5]

69.    After receiving the results of the forensic examination of the Relativity database conducted by the government's taint team [D.E. 386, 390 (under seal)], Defendant filed the Supplemental Post-Hearing Brief [D.E. 415 (under seal)].

---

[5]  On November 29, 2018, Defendant filed under seal a Supplement to Exhibit S [D.E. 383 (under seal)].

70.     Therein, Defendant claims a violation of the attorney-client privilege with respect to a significantly reduced number of documents (collectively, "Allegedly Privileged Documents"):

1. DOJ-00877675
2. DOJ-00877676
3. DOJ-00877677
4. DOJ-00877678
5. DOJ-00877679
6. DOJ-00877680
7. DOJ-00877681
8. DOJ-00877683
9. DOJ-00911199
10. DOJ-00911200
11. DOJ-00911207
12. DOJ-00911250
13. DOJ-00911269
14. DOJ-00911271
15. DOJ-00911339

See Government's Response to Defendant's Supplemental Post-Hearing Brief [D.E. 432 at 2 n.1 (under seal)] (extrapolating from Defendant's Supplemental Post-Hearing Brief the Allegedly Privileged Documents discussed therein).

71.     Some of these documents are emails; others are documents consisting of hundreds of pages.

72.     As explained by the government, Relativity tracks when a document is viewed and by whom, but does not provide information regarding which pages within a particular document were viewed.

## CONCLUSIONS OF LAW

Defendant seeks to suppress the documents that were sent by Canada to the United States pursuant to the MLAT Request.  Based on the foregoing factual findings and legal authorities, the undersigned concludes as follows.

> ### *First*.  *Kachkar's Fourth Amendment rights were not violated by Canada's compliance with the MLAT Request.*

As noted above, the Fourth Amendment does not generally apply to searches conducted in foreign countries.  Behety, 32 F.3d at 510.  One exception to this rule is the "joint venture doctrine," and the second exception requires a finding that the conduct of foreign officials "shocks the judicial conscience."  Id. at 510-511.  In his post-hearing submission, Defendant only argued for application of the "joint venture doctrine."  See Jack Kachkar's Post-Hearing Memorandum for his Motion to Suppress Evidence (DE 254) (hereafter, "Post-Hearing Brief") [D.E. 329 at 1-4].  Indeed, nothing in the record supports the application of the "shocks the judicial conscience" exception to this case.  Therefore, the undersigned need only address whether the process of gathering documents in Canada pursuant to the MLAT Request was a joint venture between the United States and Canada.  This issue turns on the level of participation by federal agents in the execution of the Gathering Order.

Defendant argues that a joint venture finding is supported by the following facts:

(1) Only the United States pursued an investigation of Kachkar; Canada conducted no independent investigation.

(2) After submitting the MLAT Request, DOJ sent to Canadian officials the MLAT Supplemental Request for Assistance, which included the following language:  "Additionally, please allow U.S. investigators to be present when the person or persons designated to execute the order reviews the over 400 boxes and dozens of hard drives.  The U.S. investigators will not remove any material from the premises, but their presence will assist in determining which material is relevant."  Def's Ex. K.

(3) The FDIC-OIG agents who traveled to Canada conducted the review of the 400 boxes of documents to cull the ones that were responsive to the MLAT Request.

(4) Agent Sherrill and a prosecutor travelled to Canada to retrieve and secure the second production, involving approximately 49 boxes, for shipment to a scanning contractor.

See Defendant's Post-Hearing Brief [D.E. 329 at 3-4].[6]

Initially, the undersigned notes that Canada's lack of involvement in any independent investigation of Defendant is irrelevant to the joint venture analysis. See Behety, 32 F.3d at 510 (The joint venture doctrine applies "if American law enforcement officials substantially participated in the search or if the foreign officials conducting the search were actually acting as agents for their American counterparts").

With regard to the language in the MLAT Supplemental Request for Assistance, Agent Sherrill credibly testified that, at the time of the document review, what he was told was that the Toronto Police Services had asked for assistance. Regardless of who initiated it, the proposition was simply that the agents be present to assist in determining which materials were relevant to the MLAT Request. Proposing such a limited role does not rise to the level of engaging in a joint venture. Id. ("Joint venture doctrine" requires substantial participation in a foreign search.).

Indeed, Agent Sherrill's credible testimony confirms that the FDIC-OIG agents who traveled to Canada did nothing more than follow Detective Lum's instructions to assist him in complying with the MLAT Request, which instructions consisted of telling the agents that they "were there to assist him in making—trying to make sure that he got all the records that the MLAT asked for, but at the same time, not get records that were beyond the scope of the MLAT." See 10/1/18 Transcript [D.E. 314 at 105].

Agent Sherrill's description of how he conducted his review comports with these instructions:

---

[6] The facts upon which Defendant relies are described in accordance with the undersigned's Findings of Fact.

- After opening a box, he would take out the binders or files, looking for the word "Inyx" and if he found it he would look for the date.

- If the date fell within the 2005-2007 time period, he would tell Detective Lum that the box fell within the scope of the Gathering Order.

- Once he found the word "Inyx" and the date frame in a box, he did not continue reviewing that box.

- No notes, pictures or copies were made of the documents.

- After each box was reviewed, it was placed in a pallet designated as "responsive" or "non-responsive" as appropriate; there was also a third pallet for records that were marked "privileged."

Agent Sherrill also stated that:

- If the FDIC-OIG agents found an envelope or folder marked privileged, the agents did not open them and simply advised Detective Lum that the box contained privileged materials.

- Both Detective Lum and Kachkar were present during the review and the FDIC-OIG agents could not proceed in their absence.

- The entire review process took three to four days.

- Throughout the review process, Detective Lum was working with an inventory of the boxes, but Agent Sherrill did not see a final inventory of the boxes that were gathered.

Agent Sherrill's only additional involvement was to travel to Canada with a prosecutor to retrieve and secure the second production, involving approximately 49 boxes, for shipment to a scanning contractor.

Agent Eaton's description of the review process is consistent with Agent Sherrill's:

> So generally, there was a room that had either just a desk on kind of either side or a long bench. We would go to the big pallet and just take the next box on the top. I believe agent or Officer Sinbad would let—record what box was being taken. We would place it on the credenza, shall we say, and lift the lid, go through it and yes, it says Inyx and it's 2005 and it's an invoice, then okay, we've got some relevant documents here. Came across anything that was in an envelope marked privileged, we knew that was going to go to the privilege stack.

Id. at 130.

Contrary to Defendant's contention, this attenuated and subordinate level of participation by FDIC-OIG agents in Canada's compliance with the MLAT Request does not satisfy the "joint venture doctrine." See Behety, 32 F.3d at 511 (DEA agents being present and videotaping a foreign search "does not constitute the level of participation [the 'joint venture'] exception contemplates."); United States v. Rosenthal, 793 F.2d 1214, 1231 (11th Cir. 1986) (American agents being apprised of Colombian officials' plans to search defendant's residence and their being present during the search and seizure conducted by the Colombian officials did not satisfy the "joint venture doctrine").

By contrast, the only two cases cited by Defendant in which the "joint venture doctrine" was applied involved a substantial level of involvement on the part of U.S. law enforcement personnel. In United States v. Peterson, 812 F.2d 486 (9th Cir. 1987) the "DEA was involved daily in translating and decoding intercepted transmissions, as well as advising the Philippine authorities of their relevance." Id. at 490. In United States v. Emery, 591 F.2d 1266, 1268 (9th Cir. 1978), the defendant challenged the "[f]ailure of the Mexican authorities to comply with the requirements of Miranda." Id. at 1267. The court found that the "joint venture doctrine" applied because D.E.A. agents "substantially participated in the entire arrest" of the defendant. Id. at 1268. Specifically, "D.E.A. agents alerted the Mexican police of the possible activity,

coordinated the surveillance at the Guaymas airport, supplied the pilot for the plane and gave the signal that instigated the arrest once it was determined that the marijuana was in the suitcase [carried by the defendant]." Id. at 1268.

Having found that the "joint venture doctrine" does not apply to this case, the undersigned concludes that Kachkar's Fourth Amendment rights were not violated by Canada's compliance with the MLAT Request.[7]

> **_Second_**. _Kachkar's Fourth Amendment rights were not violated by the government's failure to obtain a search warrant for the documents after they were sent from Canada._

Defendant initially argues that the government had to obtain a search warrant in order to review the documents that were sent from Canada in compliance with the MLAT Request. Defendant relies for this proposition on domestic Fourth Amendment cases. See Defendant's Post-Hearing Brief [D.E. 329 at 12-14]. However, as discussed above, the Fourth Amendment's protection in cases involving foreign officials is limited to the "joint venture doctrine" and the "shocks the conscience of the court" exceptions, neither of which applies here. See United States v. Emmanuel, 565 F.3d 1324, 1330 (11th Cir. 2009) ("The general rule is that evidence obtained from searches carried out by foreign officials in their own countries is admissible in United States courts, even if the search would not otherwise comply with United States law or

---

[7]  Given this conclusion, the undersigned need not address Defendant's contention that the Canadian search was unreasonable on the grounds that: the documents were obtained from the Successor Receiver, PwC, rather than being seized pursuant to a search warrant; and the 400-odd boxes included documents that Kachkar claimed were privileged.  See Defendant's Post-Hearing Brief [D.E. 329 at 4-11]. Nevertheless, that contention lacks merit.  As noted by the government, Canadian procedures allow for responses to MLAT requests to be effectuated by gathering order or by search warrant and a search warrant is needed only where there is a risk of destruction of evidence. See Government's Response to Defendant's Post-Hearing Brief [D.E. 336 at 4] (citing Mutual Legal Assistance in Criminal Matters ("MLACMA") §§ 12, 18).  Given that the documents sought in the MLAT Request were in the custody of the Successor Receiver, Canadian officials properly opted to obtain a Gathering Order. Defendant's additional claim of unreasonableness based on the inclusion of documents that Kachkar claimed to be privileged is equally unpersuasive.  The record shows that Kachkar was given ample opportunity, which he exercised, to assert his privilege claims throughout the process.

the law of the foreign country.") (citing <u>Rosenthal</u>, 793 F.2d at 1230).  By arguing that the government was required to obtain a search warrant after the documents arrived in the United States in order to comply with the Fourth Amendment, Defendant is simply attempting to circumvent this general rule.

> ### ***Third.    Assuming he has established prejudice, suppression of evidence is the proper remedy for Kachkar's claim that the government invaded the attorney-client privilege.***

Defendant next argues that the government improperly viewed documents that he claims are privileged.   In his Supplemental Post-Hearing Brief [D.E. 415], Defendant seeks the following remedies for this alleged invasion of his attorney-client privilege: suppression of the evidence obtained through the MLAT Request, dismissal of the Indictment; dismissal of the Counts that he claims are based on the improperly viewed documents; or disqualification of the trial team.

Initially, the government argues that Defendant has not met his burden of establishing that the Allegedly Privileged Documents are actually protected by the attorney-client privilege. The undersigned assumes that Defendant has met this burden only for purposes of this Report and Recommendation.

To obtain the remedies of dismissal, suppression or disqualification, Defendant must also show misconduct on the part of the government that causes prejudice to him.  <u>See</u> <u>Ofshe</u>, 817 F.2d 1515-16; <u>Walker</u>, 243 F. App'x at 622-24; <u>Stewart</u>, 294 F. Supp. 2d at 494.  Moreover, suppression of evidence rather than dismissal or disqualification, is the less drastic, hence preferred, remedy.  <u>See</u> <u>Melvin</u>, 650 F.2d at 644; <u>Deluca</u>, 2014 WL 3341345, at *8; <u>Kaufman</u>, 2005 WL 2087759, at *4; <u>Stewart</u>, 294 F. Supp. 2d at 494.

In his attempt to establish the requisite prejudice, Defendant argues that the government's viewing of the Allegedly Privileged Documents likely has influenced the government's overall trial preparation and strategy. The government has submitted a point-by-point rebuttal of Defendant's argument, both in terms of the contents of the Allegedly Privileged Documents and the viewing dates recorded by the Relativity forensic analysis. See generally, Government's Response to Defendant's Supplemental Post-Hearing Brief [D.E. 432 (under seal)]. The undersigned finds the government's rebuttal to be effective in neutralizing Defendant's vague claim of likely prejudice. Moreover, the government has stated that it does not intend to introduce the Allegedly Privileged Documents as evidence at trial in its case-in-chief. Id. at 2. This posture renders Defendant's attenuated prejudice claim moot.[8]

## RECOMMENDATION

Based on the foregoing considerations, the undersigned RESPECTFULLY RECOMMENDS that Defendant's' Motion to Suppress be DENIED.

Pursuant to Local Magistrate Judge Rule 4(b), the parties have **seven** days from the date of this Report and Recommendation to file written objections, if any, with the Honorable Darrin P. Gayles. Failure to timely file objections shall bar the parties from attacking on appeal the factual findings contained herein. See Resolution Tr. Corp. v. Hallmark Builders, Inc., 996 F.2d 1144, 1149 (11th Cir. 1993). Further, "failure to object in accordance with the provisions of [28 U.S.C.] § 636(b)(1) waives the right to challenge on appeal the district court's order based on unobjected-to factual and legal conclusions." See 11th Cir. R. 3-1 (I.O.P. - 3).

---

[8] Should Defendant present a case at trial and the government seek to introduce any of the Allegedly Privileged Documents in rebuttal, the Court could consider revisiting this issue at that juncture.

RESPECTFULLY SUBMITTED in Miami, Florida this 26th day of December, 2018.


ALICIA M. OTAZO-REYES
UNITED STATES MAGISTRATE JUDGE


cc:    United States District Judge Darrin P. Gayles
        United States District Judge Donald L. Graham
        Counsel of Record