UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 16-20595-CR-GAYLES (GRAHAM)

UNITED STATES OF AMERICA

vs.

JACK KACHKAR,

    Defendant.
_____/

## SENTENCING MEMORANDUM OF THE UNITED STATES

The defendant, Jack Kachkar, masterminded and orchestrated two multimillion dollar bank frauds: (1) a massive, international scheme that caused over $100 million in losses to Westernbank; and (2) a multimillion dollar scheme causing almost $2 million in losses to Mellon Bank. The defendant perpetrated this scheme so that he could live an uber-lavish lifestyle far beyond his legitimate means that included spending tens of millions of dollars on a private jet, high-end real estate, extravagant hotels, expensive cars, and luxury clothes and jewelry. As a result of his conduct, he caused the collapse of Westernbank and put the livelihood of more than 1,500 people in jeopardy.

The defendant's sentence should reflect the nature and circumstances of his schemes and his role in them. The United States requests that the Court adopt the factual allegations set forth in the final Presentence Investigation Report (PSI), calculate the advisory Sentencing Guidelines range as set forth in the PSI, weigh the factors set forth in 18 U.S.C. § 3553(a) and discussed in this Memorandum, and sentence the defendant to a substantial period of incarceration to reflect the seriousness of the defendant's crimes.

The United States also requests that the Court enter an order of restitution to the Federal Deposit Insurance Corporation (FDIC) (as receiver for Westernbank) and to Iberia Bank, as a successor in interest to Mellon Bank, as victims of the defendant's crimes.

## Procedural History

As the Court is aware from presiding over the nearly three-week trial as well as numerous pre-trial and post-trial proceedings in this case, on February 4, 2019, the jury convicted the defendant of nine counts of wire fraud affecting a financial institution, in violation of 18 U.S.C. § 1343. The final PSI was filed on June 11, 2019. (D.E. 578.) The advisory guideline range as calculated in the PSI is a level 43, and equals life imprisonment.

## Argument

### A. Application of 18 U.S.C. § 3553(a) Factors

Because 18 U.S.C. § 3553(a) requires the Court to consider the factors set forth in the statute in order to fashion an appropriate sentence, this Memorandum addresses each factor in turn.

#### *1a.   Nature and circumstances of offense*

The heart of this case is the massive, multinational fraud against Westernbank that the defendant orchestrated and effectively concealed from the bank for nearly two years—from 2005 to 2007. As set forth more fully in the PSI, and as the trial evidence showed, the defendant masterminded the scheme to defraud Westernbank when he caused Westernbank to enter into a series of loan agreements in exchange for a security interest in the assets of his company, Inyx. Under the loan agreements, Westernbank agreed to advance money based on Inyx's customer invoices from "actual and bona fide" sales to Inyx customers.

During the course of the scheme, the defendant caused numerous Inyx employees to make tens of millions of dollars' worth of fake customer invoices that were purportedly payable by Inyx

2

customers (in the United Kingdom, Sweden and elsewhere). To accomplish this, the defendant misled his own people. For example, he misrepresented to Colin Hunter that Westernbank would fund hypothetical or "futuristic" invoices, and instructed Jack Hamerski and Rima Goldschmidt to raise invoices without providing them with supporting documentation. Similarly, he made false representations to Joseph Rose that the bank had agreed to allow Inyx to keep customer payments rather than have them sent to Westernbank.

The defendant misled Westernbank by causing these false invoices to be presented as valid invoices to obtain financing from the bank. Despite causing his employees to maintain two different sets of accounts receivable reports—including falsely inflated reports that he caused to be sent out to Westernbank—the defendant himself consistently told Westernbank executives that the invoices were good and payable.

The defendant prolonged his fraud scheme and delayed its discovery by repeatedly lying or directing lies to Westernbank executives about purported and imminent repayments from other lenders (in the United Kingdom, Norway, Libya and elsewhere) in order to lull Westernbank into continuing to lend money to Inyx. In truth, and as the defendant knew, these lenders had not agreed to repay Westernbank's loan. As part of this lulling scheme, the defendant even caused the presentation of a forged and false letter from a financial institution (Pareto) in Norway. Finally, the defendant personally lied to Westernbank executives to induce Westernbank to lend additional funds, when he represented that he had additional collateral, including purported mines in Mexico and Canada worth hundreds of millions of dollars. In truth, and as the defendant knew, this additional collateral was worth barely a fraction of what he represented. To further these lies as part of his lulling scheme, as the trial evidence showed, the defendant fraudulently altered a

valuation spreadsheet of the copper mine that he sent to Westernbank to make it appear that this potential mining property did not need a $75 million upfront investment.

Further, to delay discovery of his fraud, the defendant also lied to his own company's auditors. During the scheme, the defendant transferred over nine million dollars to a shell company called Zircon Consulting LLC (Zircon) that, the evidence showed, was an associate of the defendant and returned funds to the defendant in various ways. When Inyx auditors questioned these Zircon transfers, the defendant attempted to cover his tracks by submitting to the auditors a false and fraudulent letter indicating that a bank in Kazakhstan held over $7 million in funds from Zircon when in truth, and as the defendant knew, it did not.

Throughout the scheme, he siphoned the fraud proceeds to bank accounts he controlled in order to fund his extremely lavish lifestyle. The record at trial shows that the defendant diverted over $32 million for his own benefit of approximately: (a) $16 million to his personal accounts; (b) $9 million to a shell account; and (c) $6 million to his credit card. (Ex. 40-9A). The defendant diverted these funds so he could purchase:

- A private jet (owned by Jack Nicklaus) for $16 million with millions in annual fuel and maintenance costs;

- Luxury homes including (a) a $6.5 million waterfront property on Key Biscayne, (b) a $3.6 million condo on Key Biscayne, (c) a $2.5 million condo in Key Biscayne, (d) a $1.4 million condo on Brickell, (e) a $1.2 million condo on Brickell, and (f) a $800,00 condo on Brickell;

- Luxury vehicles including (a) a 2005 Aston Martin DB9, (b) a 2005 Ferrari Super America, (b) a 2006 Ferrari 612, (c) a 2007 Bentley Continental, (d) a 2007 Ferrari F430, (e) a 2008 Lamborghini Murcielago, (f) a 2008 Range Rover, and (g) a 2008 Porsche Cayenne.

- Luxury hotel stays including, among others, $600,000 for the Hotel George V in Paris, $54,000 for the Burj Al Arab in Dubai, and $37,000 for the Royal Riviera Hotel in the South of France.

- Luxury items including, among others, almost $97,000 at East Coast Jewelry, almost $70,000 at Cartier, and nearly $70,000 at Brioni.

This is not the white-collar case often seen where a defendant makes false representations in desperation to save his company. Instead, the defendant orchestrated this scheme from the beginning to steal from Westernbank. Indeed, on the first day of the Westernbank loan (March 31, 2005), the bank wired approximately $3.5 million to the Inyx corporate account controlled by the defendant. Just one day later, the defendant wired $2.295 million from the Inyx account to his own personal account for use as a deposit to build a mansion on the waterfront in Key Biscayne. (PSI ¶ 154).

Even at the very end, in June 2007, the defendant repeatedly promised Westernbank executives that he would make the bank whole for its $142 million in loans. Yet the defendant hid and concealed valuable assets from the bank. For example, the defendant did not offer to send Westernbank the $8.5 million in cash in his family trust from the sale of Inyx stock from March 2007 to May 2007. Similarly, the defendant did not offer the bank executives his investment account at National City with a $5 million balance as of June 2007. Instead, the defendant offered these executives, what they described as, worthless and overleveraged assets from which they could not recover any funds. In fact, to this day, the defendant has never made a single payment on any of his outstanding judgments to Inyx or the FDIC.

As a result of the defendant's fraud, Westernbank suffered losses exceeding $100 million directly on the Inyx loan. Westernbank suffered tens of millions of dollars in additional losses on legal and accounting costs relating to this fraud. This fraud triggered the collapse of Westernbank putting the livelihood of its 1,500 employees in jeopardy. Ultimately, the FDIC assumed control of the bank and suffered billions of dollars in losses as a result of the administration of Westernbank.

The defendant's separate Mellon Bank fraud scheme further informs the nature and circumstances of his offenses. In October 2007—mere months after Westernbank called the Inyx loans, such that he could no longer siphon fraud proceeds from that bank—the defendant turned to defrauding Mellon Bank in Miami. He knowingly deposited a $3 million check that his sister (and representative) led the bank to believe were proceeds from the purported sale of his private jet. The evidence and reasonable inferences drawn therefrom show that at the time of its deposit, the defendant knew that the check was worthless and that he then caused the false representation that the check came from the sale of his plane to induce the provisional credit of funds. After receiving a provisional credit for the check from Mellon Bank, the defendant wired out all of the provisional credit, including a $1 million wire to his personal account in Canada. When Mellon Bank requested to reverse this $1 million wire, Kachkar refused to do so, resulting in at least a $1 million loss to Mellon Bank. Again, the defendant's motivations are clear in this case as well -- greed. Less than a week after defrauding Mellon Bank, he placed over $100,000 in deposits on three luxury cars (a Maserati, a Bentley, and a Ferrari) in a single day. (Ex 40-B).

### *1b.    History and Characteristics of the Defendant*

The defendant holds a medical degree, speaks multiple languages, and is plainly an intelligent individual. From 2005 to 2007, the defendant had a substantial salary at Inyx of nearly $300,000 and significant stock holdings. (Ex. 40-9B). But, as shown above, it was not enough for him and he defrauded Westernbank and Mellon Bank to live far above his means. And as his history shows, the Westernbank and Mellon Bank fraud are not isolated incidents.

The defendant's history reflects almost two decades of fraudulent activity spanning numerous countries. In particular, as summarized in the PSI and according to the Rule 15 deposition testimony of Patricia Misutka testified that, in 1997, the defendant asked her to use her

one bedroom apartment as the purported corporate address of a company called Amadeus Holdings in Toronto.  That same year, Misutka observed the defendant fax a document from Amadeus to Deloitte and Touche in the United States purporting to show Amadeus had purchased approximately $2.8 million in magnets from a company called YBM Magnex (the Eastern District of Pennsylvania indicted the operators of YBM in 1999 in a nearly one billion dollar pump-and-dump scheme).  When Ms. Misutka—who was not aware of any such purchase—questioned this, the defendant told her, "[i]t doesn't matter.  We can just shut down the company."  She understood this to mean the defendant was providing false information to the auditors.

Similarly in 2006 and 2007, the defendant engaged in a scheme to defraud the representative of Robert Louis-Dreyfus, the owner of French premier league soccer team Olympique Marseille, in connection with a proposed purchase of the team.  In particular, the defendant used a false and fraudulent bank letter from Countrywide in the United States purportedly showing a substantial line of credit (approximately 81.5 million Euros) available to the defendant relating to the purchase of the team.  A criminal court in France convicted the defendant of fraudulent representation and attempt to commit fraud—and the former charge was confirmed on appeal.

Finally, from 2011 to 2016, the defendant engaged in a scheme to defraud Douglas Brown in Switzerland.  As detailed in the second superseding indictment, the defendant falsely represented that the FDIC had agreed to pay a substantial judgment to the defendant when, in truth and in fact, the defendant owed the FDIC a substantial judgment.  Based on these misrepresentations, Douglas Brown wired approximately $1.7 million to the defendant.  The United States charged this conduct in Count 10 of the Second Superseding Indictment, but Douglas Brown died before trial and so the government dismissed this count.

All of this fraudulent activity shares a hallmark consistent with the Westernbank fraud. A lie in one country with the truth in a different country. This type of fraud poses serious difficulties for law enforcement to prosecute as it requires requests for mutual legal assistance from foreign countries and the prosecuting country has no ability to compel foreign witnesses to confirm the false nature of the representation.

Finally, despite all this fraudulent activity, the defendant has shown no remorse for his actions. Instead, he constantly blames others. The defendant constantly faults Westernbank executives for what he claims were negligent practices (which, as far as the Inyx loan was concerned, essentially amounts to a claim that the bank should have detected his fraud sooner). The defendant contends that the Inyx employees that testified against him were biased. The defendant claims that federal law enforcement agents and prosecutors took too long to investigate the defendant's complex and multinational scheme.

This lengthy history of fraudulent conduct, coupled with his inability to accept responsibility for his actions, shows that the defendant believes himself to be above the law, and underscores the need for a substantial sentence.

### 2. *Need for Sentence to Reflect Seriousness of Offense; Afford Adequate Deterrence; Protect the Public; and Provide Any Needed Correctional Treatment*

A substantial sentence is appropriate to reflect the nature and seriousness of the defendant's offense; specifically, (a) the defendant's role in masterminding the scheme; (b) the complexity and international nature of the scheme making it difficult to unravel; (c) the massive losses of over $100 million caused to Westernbank; and (d) the resulting harm caused by the collapse of the bank—including the 1,500 former employees of Westernbank that suffered as a result of the defendant's greed.

A substantial period of incarceration reflecting the seriousness of the defendant's crimes is also appropriate to promote individual deterrence. As explained above, the defendant's history of criminal activity, greed, and lack of remorse indicate that a significant sentence is appropriate to protect the public from further crimes of this defendant.

A substantial sentence is also appropriate to deter the public from engaging in frauds, such as this, that could have devastating impact. In short, the public needs to know that a $100 million fraud will result in a lengthy sentence. As reflected in the next section, courts have consistently imposed substantial sentences for such frauds.

The defendant's need for medical care is reflected in the PSI. The government is not aware of any educational, vocational, or other correctional treatment needs of the defendant that should be considered for sentencing purposes.

### 3. *The Kinds of Sentences Available*

Incarceration is the most appropriate sentence available.

### 4. *The Sentencing Range as Reflected in the Sentencing Guidelines*

The Sentencing Guidelines recommend a sentence of life.

### 5. *Any Pertinent Policy Statement*

The Court should take into account the Sentencing Guidelines as a whole in determining the advisory guideline range and in fashioning a fair and just sentence in this case.

### 6. *Need to Avoid Unwarranted Sentence Disparities among Defendants with Similar Records Who Have been Found Guilty of Similar Conduct*

In formulating its ultimate sentencing recommendation in this case, the United States has carefully considered sentences for similarly situated defendants. Courts have imposed lengthy sentences from roughly 30 years' imprisonment and above for fraud of this severity and magnitude, including the following cases:

9

- *United States v. Rubashkin*, 655 F.3d 849, 853, 868-69 (8th Cir. 2011) (affirming reasonableness of defendant's 27-year sentence for bank fraud, wire fraud, mail fraud causing over $27 million in losses, where defendant's company had a revolving line of credit secured in part by accounts receivable and defendant fabricated invoices and diverted actual income to separate accounts to falsely inflate receivables).

- *United States v. Hill*, 643 F.3d 807, 884-85 (11th Cir. 2011) (affirming reasonableness of defendant's 28-year sentence for bank fraud and conspiracy to commit bank and wire fraud in mortgage fraud scheme that caused more than $38 million in direct losses)

- *United States v. Masferrer*, 514 F.3d 1158, 1160-61, 1165 (11th Cir. 2008) (affirming defendant's 30-year sentence for bank and securities fraud resulting in between $20 and $40 million in losses, where defendant was the Chairman and CEO of a bank that knowingly hid losses and made material misrepresentations to auditors, federal regulators, and investors).

- *United States v. Cladek*, 579 Fed. App'x 962-66, 970-71 (11th Cir. 2014) (affirming defendant's 30-year sentence for wire fraud, mail fraud, and conspiracy causing losses between $50 and 69 million, where defendant sold investors fixed-interest notes allegedly secured by auto loans, but instead funneled the funds into her personal accounts to pay for her multimillion-dollar homes, and lulled investors by reassuring them of the loans' existence and profitability).

- *United States v. Schwarz*, No. 4:16-cr-10039 (S.D. Fla. 2017) (D.E. 204 at 27, 59-61) (Moore, J.) (sentencing defendant to 40 years in prison for bank fraud, conspiracy to commit bank fraud, and tax violations in connection with Ponzi scheme causing at least $170 million in losses).

- *United States v. Okun*, 453 Fed. App'x 364, 366-67, 374 (4th Cir. 2011) (affirming reasonableness of defendant's 100-year sentence for mail fraud, wire fraud, and money laundering for a "Ponziesque" scheme causing losses exceeding $125 million, where defendant purported to serve as a financial advisor, but in fact wired clients' funds to his bank account for personal use, and the district court stressed the need for adequate and deterrence and public protection from the defendant—despite defendant's heart condition, age, and lack of any criminal history).

- *United States v. Weiss*, No. 98-cr-00099-CEM-KRS (M.D. Fla.) (sentencing defendant to 835 years' imprisonment for RICO violations, wire fraud, and money laundering causing over $125 million in losses and collapse of a life insurance company).

Under the facts and circumstances of this case, and considering and comparing the defendant's case with those of other similarly situated defendants, a substantial term of imprisonment would be appropriate.

### 7. *The Need to Provide Restitution to Victims*

The sentenced imposed in this case should include an order of restitution to the victims identified in the PSI—namely, $103,490,005 to the FDIC as receiver for Westernbank and $1,861,786.71 to Iberia Bank, as a successor in interest to Mellon Bank.   (D.E. 578 at ¶ 248).

**Conclusion**

Given the Defendant's role as mastermind and orchestrator of these fraud schemes, the extensive and sophisticated nature of his criminal conduct spanning over two years and the enormous losses and harm that resulted, as well as his prior history, a substantial sentence of imprisonment reflecting the seriousness of the defendant's crimes would be sufficient but not greater than necessary to comply with the purposes of sentencing set forth in 18 U.S.C. § 3553(a)(2) and is warranted here.

Dated: June 25, 2019.

Respectfully submitted,

ARIANA FAJARDO ORSHAN
UNITED STATES ATTORNEY

By: *s/ Michael N. Berger*
Michael N. Berger
Assistant United States Attorney
Court No. A5501557
Michael.berger2@usdoj.gov
United States Attorney's Office
Southern District of Florida
99 Northeast 4th Street
Miami, Florida 33132-2111
Tel: (305) 961-9445
Fax: (305) 536-4699

*s/ Michael T. O'Neill*
Michael T. O'Neill
Trial Attorney
Court No. A5501996
Email: Michael.t.oneill@usdoj.gov
Fraud Section, Criminal Division
U.S. Department of Justice
1400 New York Avenue, N.W.
Washington, D.C. 20005
Tel: (202) 616-1545
Fax: (202) 514-0152

## CERTIFICATE OF SERVICE

I certify that on June 25, 2019, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF.

By: *s/ Michael N. Berger*
Michael N. Berger
Assistant United States Attorney