UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

CASE NO. 16-20595-CR-GAYLES (GRAHAM)/OTAZO-REYES(s)(s)

UNITED STATES OF AMERICA,
             Plaintiff,

vs.

JACK KACHKAR,
             Defendant.
_____/

### JACK KACHKAR'S MEMORANDUM IN SUPPORT OF
### SENTENCING PURSUANT TO 18 U.S.C. § 3553(a)

Jack Kachkar, through undersigned counsel, respectfully submits this Sentencing Memorandum demonstrating why he should receive a sentence substantially below the advisory guideline range.

### INTRODUCTION

"Sentencing, that is to say punishment, is perhaps the most difficult task of a trial court judge." Jack B. Weinstein, *Does Religion Have a Role in Criminal Sentencing?*, 23 Touro L. Rev. 539, 539 (2007). While there are many competing considerations in every sentencing decision, a sentencing judge must have some understanding of "the diverse frailties of humankind." *See Woodson v. North Carolina*, 428 U.S. 280, 304 (1976) (plurality opinion). In deciding what sentence will be "sufficient, but not greater than necessary" to further the goals of punishment, 18 U.S.C. § 3553(a), a sentencing judge must have a "generosity of spirit, that compassion which causes one to know what it is like to be in trouble and

in pain." Guido Calabresi, *What Makes a Judge Great: To A. Leon Higginbotham, Jr.*, 142 U. Pa. L. Rev. 513, 513 (1993); *see also* Edward J. Devitt, *Ten Commandments for the New Judge*, 65 A.B.A. J. 574 (1979), *reprinted in* 82 F.R.D. 209, 209 (1979) ("Be kind. If we judges could possess but one attribute, it should be a kind and understanding heart. The bench is no place for cruel or callous people regardless of their other qualities and abilities. There is no burden more onerous than imposing sentence in criminal cases.").

In this case, the Court should impose a sentence substantially lower than the advisory guideline range for the following reasons:

- Mr. Kachkar has significant medical issues, including ███████████████ ███████████████████████████████████████████ ███████████████████████████████████████████ ███████████████████████████████████████████ ███████████████████████████████████████████ ███████████████████████████████████████████ █████████████████████████████████

- Mr. Kachkar's conduct that formed the basis of his convictions occurred over ten years ago. In the ensuing years, his actions and the publicity surrounding the civil litigation and now the criminal case have brought enormous shame and embarrassment to him and his family. Furthermore, the collateral consequences of his convictions – including deportation and monetary penalties – will impact him and his family for years to come.

2

- The advisory guidelines applicable to Mr. Kachkar have no empirical basis and call for the Court to impose overlapping and cumulative adjustments.

- Based upon similar cases involving economic crimes, a sentence within the advisory guideline range will create great national and local disparity.

- Because of his age, education, marital status, lack of drug abuse, criminal history category, and nature of his offense, Mr. Kachkar poses a very low risk of reoffending.

Fifteen years after the Supreme Court's landmark decision in *United States v. Booker*, 543 U.S. 220 (2005), it is now "emphatically clear" that the "Guidelines are guidelines – that is, they are truly advisory." *United States v. Cavera*, 550 F.3d 180, 189 (2d Cir. 2008) (*en banc*). The Guidelines are no longer "the only consideration" at sentencing. *Gall v. United States*, 552 U.S. 38, 49 (2007). Rather, the Guidelines "merely" provide a "starting point" for the Court's sentencing considerations. *Id.; United States v. Matchett*, 802 F.3d 1185, 1194 (11th Cir. 2015). The Court is to impose its sentence after "mak[ing] an individualized assessment based on the facts presented" in each particular case. *Gall,* 552 U.S. at 49. The Court need not find "extraordinary circumstances to justify a sentence outside of the Guidelines range." *Id.* at 47. As one district court judge has put it, the Guidelines' "most fundamental flaw is the notion that the complexity of human character and conduct can be rationally reduced to some arithmetic formula." Terry Carter, *Rakoff's stance on the SEC draws fire, praise—and change: The Judge Who Said No,* ABA Journal, Oct. 2013, at 53.

This is especially true in economic crime cases such as this, where the sentencing range is largely determined by escalating loss enhancements pursuant to USSG § 2B1.1, and overlapping cumulative upward adjustments, an increasingly criticized approach that usually results in draconian advisory guidelines. *See, e.g., United States v. Adelson*, 441 F. Supp. 2d 506, 512 (S.D.N.Y. 2006) (describing "the utter travesty of justice that sometimes results from the guidelines' fetish with abstract arithmetic, as well as the harm that guideline calculations can visit on human beings if not cabined by common sense."); *see also United States v. Parris*, 573 F. Supp. 2d 745, 754 (E.D.N.Y. 2008) (noting that despite the fact that the Guidelines "reflect Congress' judgment as to the appropriate national policy for such crimes . . . this does not mean that the Sentencing Guidelines for white-collar crimes should be a black stain on common sense" and sentencing defendant "to a term of incarceration of 60 months in the face of an advisory guidelines range of 360 to life."). The Supreme Court and Eleventh Circuit's decisions have significantly broadened the discretion of courts to impose a less stringent sentence than the one suggested by the Guidelines, and in this case, the Court should exercise its broad discretion and impose a sentence substantially below the recommended guideline range.

### 1.   MR. KACHKAR'S AGE AND HEALTH CONCERNS WARRANT A SENTENCE BELOW THE ADVISORY GUIDELINES

Mr. Kachkar's age – 56 – suggests that a lengthy sentence of imprisonment would be particularly deleterious. A study commissioned by the Department of Justice's National Institute of Corrections concluded that imprisonment is

especially problematic for older inmates like Mr. Kachkar, finding that "several important factors seem to speed the aging process for those in prison" and identifying numerous management problems associated with older inmates. *See Addressing the Needs of Elderly, Chronically Ill, and Terminally Ill Inmates,* National Institute of Corrections, U.S. Department of Justice, Correctional Health Care (2004) at 8-9 (hereinafter referred to as *"Addressing the Needs of the Elderly"*) (available at https://s3.amazonaws.com/ static. nicic.gov/ Library/018735.pdf) (last accessed June 26, 2019). This study noted that older inmates: are uniquely vulnerable to abuse and predation; experience difficulty in establishing social relationships; often need special physical accommodations in a relatively inflexible physical environment; and need special programs in a setting where special privileges are disdained. *Id*. at 11.[1] The study found that older first-time offenders "are frequently severely maladjusted and especially at risk for suicide, explosiveness, and other manifestations of mental disorder." *Id*. Moreover, "[s]ince their behaviors are not well tolerated by other inmates, their victimization potential is high." *Id*.

---

[1] "Some administrators recommend that age 50 be the chronological age defining the elderly in prison. While 50 may seem young to be classified as elderly in the free world, several important factors seem to speed the aging process for those in prison. These factors include the amount of stress experienced by new inmates trying to survive the prison experience unharmed; efforts to avoid confrontations with correctional staff and fellow inmates; financial stress related to inmates' legal, family, and personal circumstances; withdrawal from chronic substance abuse; and lack of access to adequate medical care prior to incarceration. All contribute to inmate stress, which, in turn, accelerates the aging process." *See Addressing the Needs of the Elderly* at 8-9.

Mr. Kachkar was a relatively healthy 53-year-old man before he was arrested and detained in September 2016. As detailed in the PSI, since that time, his health has deteriorated. ████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████

First, Mr. Kachkar has already been targeted and victimized while in custody. PSI ¶ 6. As noted by DOJ, "[o]lder inmates may have difficulty relating to younger, more aggressive inmates. Additionally, they are prone to being victimized by younger inmates." *Addressing the Needs of the Elderly* at 30. While at FDC Miami, Mr. Kachkar has already been subjected to threats and extortion. In fear for his safety, he gave money to other inmates; yet he was the one who was placed in solitary confinement for 30 days. PSI ¶ 6.

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

7

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

█████████████████████████

████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

█████████████████

Section 3553(a) recognizes that the Court should take into account any medical issues facing the defendant and whether the sentence imposed will "provide the defendant . . . with needed medical care . . . in the most effective manner." 18 U.S.C. § 3553(a)(2)(D). The advisory Guidelines likewise provide that: "[p]hysical condition or appearance, including physique, may be relevant in determining whether a departure is warranted, if the condition or appearance, individually or in combination with other offender characteristics, is present to an unusual degree

and distinguishes the case from the typical cases covered by the guideline." USSG §5H1.4. Courts routinely impose below guideline sentences in cases involving defendants who suffer from serious medical conditions.

For example, following the defendant's conviction after trial for wire fraud in *United States v. Burks*, 2010 WL 1221752 (E.D.N.Y. Mar. 29, 2010), the sentencing court imposed a sentence of one month incarceration and five years' probation despite a Guidelines range of 57-71 months where the defendant suffered from degenerative diabetes. *Id.* at \*2; *see also United States v. McFarlin*, 535 F.3d 808, 810-11 (8th Cir. 2008) (affirming variance for 56-year old defendant with numerous health problems, including coronary disease and who had undergone several operations); *United States v. Alatsa*s, 2008 WL 238559 (E.D.N.Y. Jan. 16, 2008) (imposing a term of probation, despite Guidelines range of 24-30 months where, inter alia, "[d]efendant has multiple complex medical problems, which will be better cared for outside of prison.").

In *United States v. Barbato*, 2002 WL 31556376 (S.D.N.Y. Nov. 15, 2002), a pre-*Booker* decision, the defendant pled guilty to using extortionate means to collect extensions of credit. The sentencing court granted a downward departure from a then-mandatory Guideline range of 24-30 months' imprisonment based on the defendant's history of heart problems, and imposed a sentence of home detention and two years of supervised release. Notably, the *Barbate* court imposed home confinement even though the prosecution contended that the Bureau of Prisons would be able to provide adequate treatment for the defendant's health conditions.

The court noted that "[i]t is often relevant, though not always controlling, whether the BOP can provide adequate care." *Id.* at *4.

For all of these reasons, Mr. Kachkar's deteriorating physical health, together with his age, weigh strongly in favor of a sentence substantially below the advisory guideline range.

**2. THE SPECIFIC OFFENSE CHARACTERISTICS APPLICABLE IN THIS CASE IMPOSE CUMULATIVE PUNISHMENT FOR THE SAME HARM**

The first fraud guideline, § 2F1.1, included two specific offense characteristics in addition to loss: one with four subparts applicable in the alternative and one that required a floor of 12 levels. See U.S.S.G. § 2F1.1 (1987). Today, § 2B1.1 includes twenty cumulative specific offense characteristics, many with multiple alternatives. *See* U.S.S.G. § 2B1.1 (2018). In the initial guidelines, if there was "more than minimal planning" and "more than one victim," one 2-level enhancement applied. Today, "sophisticated means" and "10 or more victims" alone cumulatively produce a 4-level enhancement. Ten of the levels used to calculate Mr. Kachkar's guideline range come from specific offense characteristics in § 2B1.1 other than loss amount (2 levels for causing a substantial financial hardship to one victim, 2 levels for sophisticated means, and 4 levels for jeopardizing the safety and soundness of a financial institution), and a 4-level upward adjustment from Chapter Three for role in the offense. Without the specific upward adjustments (aside from loss), Mr. Kachkar would be facing an advisory guideline range of 108-135 months instead of Life.

As legal scholars have noted, these factors are "closely correlated" with each other and with loss. *See* Frank O. Bowman III, *Sentencing High-Loss Corporate Insider Frauds After Booker,* 20 Fed. Sent. R. 167, 170, 2008 WL 2201039, at *6 (Feb. 2008). "In effect, what the Guidelines have done over time is to tease out many of the factors for which loss served as a rough proxy and to give them independent weight in the offense-level calculus." *Id.* "The result is that many factors for which loss was already a proxy not only have been given independent weight but also impose disproportionate increases in prison time because they add offense levels on top of those already imposed for loss itself and do so at the top of the sentencing table where sentencing ranges are wide . . . . Any case involving a corporate officer and a multimillion-dollar fraud will almost always trigger application of multiple offense-level enhancements that have the effect of punishing the defendant over and over for the same basic thing – conducting a big fraud in a corporate setting." *Id.* at *7. *See also* Samuel W. Buell, *Overlapping Jurisdictions, Overlapping Crimes: Reforming Punishment of Financial Reporting Fraud,* 28 Cardozo L. Rev. 1611, 1648- 49 (2007) (factors such as sophisticated means and large number of victims "double-count because they are captured by other enhancements or by the loss calculation."); Alan Ellis, John R. Steer, Mark Allenbaugh, *At a "Loss" for Justice: Federal Sentencing for Economic Offenses,* 25 Crim. Just. 34, 37 (2011) ("the loss table often overstates the actual harm suffered by the victim," and "[m]ultiple, overlapping enhancements also have the effect of 'double counting' in some cases,"

while "the guidelines fail to take into account important mitigating offense and offender characteristics.").

The Commission has recognized this problem of "factor creep" – as "more and more adjustments are added to the sentencing rules, it is increasingly difficult to ensure that the interactions among them, and their cumulative effect, properly track offense seriousness." USSC, *Fifteen Years of Guideline Sentencing* 137 (2004) (available at https://www. ussc.gov/sites/default/files/pdf/research-and-publications /research-projects-and-surveys/miscellaneous/15-year-study/15_year_study_ full.pdf)(last accessed June 26, 2019).

In 1999, Justice Breyer warned that "[t]here is little, if anything, to be gained in terms of punishment's classical objectives by trying to use highly detailed offense characteristics to distinguish finely among similar offenders. And there is much to be lost, both in terms of Guideline workability and even in terms of fairness (recall the Guidelines' logarithmic numerical scales). . . . The precision is false." *See, e.g.,* Justice Stephen Breyer, *Federal Sentencing Guidelines Revisited*, 11 Fed. Sent'g Rep. 180, 1999 WL 730985, at *11 (1999). Since the Commission has not corrected the problem of multiple overlapping enhancements (and indeed exacerbated the problem), many courts have recognized that a departure or variance is warranted to avoid it. *See, e.g.*, *United States v. Lauersen*, 362 F.3d 160, 164 (2d Cir. 2004) (subsequently vacated in light of *Booker*) (upholding departure to mitigate effect of "substantially overlapping enhancements" at the high end of the fraud sentencing table); *United States v. Parris*, 573 F. Supp. 2d 744, 745 (E.D.N.Y.

2008) (guidelines in security fraud cases "are patently absurd on their face" due to the "piling on of points" under § 2B1.1); *United States v. Adelson*, 441 F. Supp. 2d 506, 510 (S.D.N.Y. 2006) (guidelines in fraud cases have "so run amok that they are patently absurd on their face," and describing enhancement for "250 victims or more," along with others, as "represent[ing], instead, the kind of 'piling-on' of points for which the guidelines have frequently been criticized").

### 3.   WESTERNBANK MANAGEMENT IS RESPONSIBLE FOR THE ULTIMATE FAILURE OF THE BANK

For years, Westernbank has scapegoated Mr. Kachkar for the bank's demise. The government now has joined that effort in an attempt to incarcerate Mr. Kachkar for a longer term. The simple truth is that Westernbank's Board, management and certain other officials failed in their primary fiduciary duty to ensure that the bank was operated in a safe and sound manner. This failure, and not Mr. Kachkar's actions, led directly to the tremendous losses experienced by the Bank and ultimately the bank's insolvency.

Various experts have found the following[3]: During the years prior to closure, the Board and management embarked upon a period of rapid expansion, high loan growth, and forays into new loan products. In the years 1999 through 2009, the bank grew from a $3.4 billion to a $17.9 billion institution. The Board and management failed to properly manage or control this rapid growth. Overall risk

---

[3] The information provided in this section is taken, nearly verbatim, from two reports issued by an expert engaged by the FDIC and the Receiver for Westernbank in the course of the civil litigation: Michael Clabby, Expert Report (November 25, 2013)(attached as Exhibit A); and James A. Brown, Demand Letter (December 17, 2010)(attached as Exhibit B).

management practices failed to keep pace with the increasing risk profile of the bank. The bank lacked adequate policies, procedures, controls, and infrastructure to ensure the safe and sound condition of the bank. The Board, Senior Lending and Credit Committees and other officers directly responsible for generating and administering loans systematically ignored the procedures and controls that were in place. In addition, risk selection, diversification of risk, and loan underwriting were all extremely weak.

The bank's growth occurred primarily in higher risk lending categories: construction, land development, commercial real estate, and asset-based lending. Although the increased lending in these categories initially boosted short term earnings, the increased concentrations in these categories ultimately exposed the Bank to excessive credit risk. The directors and officers approved these loans without adequate information and knowingly violated bank policies and procedures. Many of these loans violated financial and regulatory safeguards, such as loan-to-value ("LTV") ratios, and requirements for appropriate appraisals and valuations. The bank failed to properly report construction loans with excess LTV ratios (of which there were many), thus hiding a significant problem from the regulators. Further, to prevent loans from being classified, and to enable themselves to continue to book interest received, the directors and officers approved and extended additional credit to replenish interest reserves, even as the economic viability of the projects continued to deteriorate. According to the FDIC, these extensions were approved and made recklessly in violation of the bank's policies and procedures and

14

prudent underwriting practices.

The Board and senior management were well aware of these issues through FDIC examination reports, warnings from auditors, and other sources of material deficiencies in the operations of the Bank, including the Bank's lack of sufficient internal controls. They ignored the warnings. Multiple FDIC reports of examination warned management of material deficiencies in operations and internal controls. Unsafe and unsound practices noted in the FDIC's reports of examination for the years 2004 through 2008, included:

- Violations of rules and regulations regarding LTV ratios and the reporting thereof

- Deficiencies in loan review processes

- Advancing of new funds without appropriate appraisals

- Inadequate underwriting procedures

- Poor loan administration

- A lack of independent of loan reviews

- Failure to insure adequate credit risk management practices/ procedures

- Failure to improve the Bank's loan review program

- Failure to identify risk in a timely manner

- Inappropriate ALLL (allowance for loan and lease loss) methodology for the risk profile of the bank

- Failure to address examiner/auditor recommendations in a timely manner

- Failure to monitor or address loan concentrations

- Ongoing violations of laws and regulations

- Failure to maintain adequate capital levels

- Lack of independent directors

The Bank's external auditor, Deloitte & Touche, LLP ("Deloitte"), also alerted the Board and senior management to serious problems within the Bank. In an April 2006 management letter, Deloitte made various recommendations to improve the Bank's "significant deficiencies." The auditors noted, among other things, that the rapid expansion of the Bank's lending function had left the Bank with an outdated credit review function to monitor loans for possible impairment. Deloitte found particular fault with the bank's asset based lending division (WBC) and recommended that WBC:

- Increase and enhance resources assigned ascertaining that all are appropriately qualified, including relevant experience in asset-based lending

- Provide relevant formal and periodic technical training to current personnel

- Enhance the analysis performed to detect impaired loans.

- Enhance the documentation of the analysis performed to determine the adequacy of the specific reserves, including rationale and evidence supporting collateral realizable values.

Consequently, not only were the Board and senior management warned of the problems at the bank generally, they also were alerted to problems with the WBC division in particular.

The Board and senior management knew that the Bank's overall financial condition was deteriorating years before closure. For example, from 2005 forward, asset quality declined precipitously. This was a clear signal to the Board and senior

16

management of the severe problems within the bank. Significantly, these problems arose years before the national recession. As of March 31, 2005 (the month the bank entered into the initial loan agreement with Inyx), the regulators categorized $63,482,000 in assets as substandard. A year later, as of March 31, 2006, the regulators categorized $204,747,000 in assets as substandard - nearly a fourfold increase in one year.

Despite these glaring red flags, the Board and management failed to take effective curative actions and the Bank continued to make reckless and imprudent loans and loan extensions. Overall, the Board and management failed to take timely remedial actions to address the severe problems described above, which led directly to the losses described below. With respect to the WBC division, the Board and senior management permitted one man – Miguel Vazquez – to have virtual carte blanche control over a portfolio worth $1.5 billion.

In filings with the Securities and Exchange Commission, the bank restated certain prior financial results for the years 2005 and 2006. In those filings, the Board and the Bank's independent accountants acknowledged the lack of controls, underwriting weaknesses, and inadequate risk management that existed at the bank. *Essentially, the Board and its auditors admitted to the unsafe and unsound conditions that caused the losses at issue.*

The Board was required to approve all loans over $50 million. The Senior Loan Committee was required to approve all loans over $5 million. As shown below, the Board and the Senior Loan Committee repeatedly approved and ratified loans,

loan increases, and loan extensions in violation of bank policies and procedures and federal regulations and that were otherwise reckless and imprudent.

In breach of their fiduciary duties to the bank, the board members W Holding favored their short term personal interests over the safety and soundness of the Bank and the federally insured deposits entrusted to them. They treated the bank as an earnings catalyst for W Holding. The meetings of the Board of the Bank and the Board of W Holding were held simultaneously.

The combined board meetings narrowly focused on short term growth and the price of W Holding stock, with little regard for the problems that eventually led to the failure and closure of the bank. These directors owned stock in W Holding and benefited personally from any short term stock appreciation. Acting to serve that interest, the directors embarked on an ill-advised growth strategy which sought short term growth results. As discussed below with respect to loans, they took every opportunity to book short term profits, which only served to disguise the problems growing under the surface.

As these experts have concluded, the gross negligence of the bank's Board, the Senior Loan Committee, and certain other officers led directly to the massive losses suffered by the bank. The following loans, in addition to the Inyx loans, contributed substantially to the Bank's losses and ultimate failure: Museum Towers LP; Plaza CD Development Corp.; Yasscar Development Corp. Loan; Yasscar Caguas Development Corp. Loan; Intercoffee, Inc. Loan; Palmas Lakes, Inc. Loan; 362 Del Parque Corp. Loan; and two Sabana Del Palmar Loans.

Based upon the foregoing, Mr. Kachkar should not be held accountable for the actions of Westernbank's Board and top management.

### 4.   A SENTENCE SUBSTANTIALLY LOWER THAN THE ADVISORY GUIDELINES IS NEEDED TO AVOID UNWARRANTED DISPARITIES

The Court must consider the need to avoid unwarranted disparities among defendants with similar criminal histories convicted of similar criminal conduct. 18 U.S.C. § 3553(a)(6). The court should avoid unwarranted similarities in sentencing among defendants who are different in ways not accounted for in the guideline range, *see Gall,* 552 U.S. at 55 ("need to avoid unwarranted similarities among other co-conspirators who were not similarly situated"); and unwarranted differences among defendants whose conduct and characteristics are similar. *See Parris*, 573 F. Supp. 2d at 753, 756-62. In fiscal year 2018, sentences below the guideline range were imposed in 57.5% of all fraud cases; 15.2% were government-sponsored, 42.3% were non-government sponsored. *See* USSC, *2018 Sourcebook of Federal Sentencing Statistics*, tbl.E-7 (available at <u>https://www.ussc.gov/sites/</u> default/files/pdf/research-and-publications/annual-reports-and-sourcebooks/2018/2018-Annual-Report-and-Sourcebook.pdf (last accessed June 26, 2019).

In considering the issue of disparity, the Court should take into account that the government *only* prosecuted Mr. Kachkar. The government did not bring charges against Jay Green, Colin Hunter, Steven Handley, or Rima Goldschmidt. In

addition, the government did not prosecute Miguel Vazquez for any of the various criminal banking offenses he committed.

Apart from the significant disparity that a guideline sentence would create, the chart attached as Exhibit C includes a sample of fraud cases from districts across the country, many of which involved losses far greater than in this case, in which defendants received sentences substantially below the guideline ranges applicable in those cases, and substantially below the guideline range of Life as recommended by the PSI. A sentence for Mr. Kachkar within the guideline range would exaggerate the disparity that the law demands be narrowed.[4]

### 5. MR. KACHKAR POSES A VERY LOW RISK OF RECIDIVISM

Because of the nature of these offenses, the damage done to his reputation, his advanced age at the likely time of his release, and his serious health issues, Mr. Kachkar poses a very low risk of recidivism. *See, e.g., United States v. Smith*, 275 F. App'x 184, 187 (4th Cir. 2008) (affirming 54 months downward variance in part because of low risk of recidivism). Mr. Kachkar is 56 years old, in Criminal History Category I, a college graduate, has been employed throughout his adult life, has been married for twenty-five years, and has no history of drug abuse. Combined

---

[4] A comparison to other crimes also demonstrates that a sentence lower than the advisory guideline range would be reasonable. For fiscal year 2017, the median sentence for murder was 180 months; for sexual abuse was 120 months;  for money laundering was 18 months; and for racketeering/extortion was 60 months. USSC, *Interactive Sourcebook of Federal Sentencing Statistics* (2018) (available at https://isb.ussc.gov/api/repos/:USSC:table_        xx.        xcdf/        generatedContent?table_num=Table13) (last accessed June 26, 2019).

with the nature of his offenses, studies demonstrate these factors lead to the conclusion that Mr. Kachkar poses a very low risk of recidivism.

As to the nature of the instant offense, "white-collar" offenders generally are considered low risk by the Sentencing Commission and pose very little risk of reoffending. USSC, *Measuring Recidivism: The Criminal History Computation Of The Federal Sentencing Guidelines,* at 13 (available at https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2004/200405_Recidivism_Criminal_History.pdf)(last accessed on June 26, 2019).

Statistical data from a study commissioned by the Sentencing Commission also show that "[r]ecidivism rates decline relatively consistently as age increases." *Id*. at 12. That study indicates that a defendant over the age of 50 and in Criminal History Category I has a 6.2% likelihood of recidivating. *Id*.  Beyond his age, a number of other characteristics make recidivism highly unlikely, including Mr. Kachkar's advanced level of education and lack of illicit drug use. *See id*. at 12-13.

A related study of recidivism rates by first offenders showed that such first offenders had a "primary" recidivism rate (including supervised release/probation violations, re-arrest, and re-convicted) of 6.8%, and a re-conviction rate (involving an actual conviction for a subsequent offense) of only 2.5%. U.S.S.C., Recidivism and the "First Offender" (2004) (available at: https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2004/200405_Recidivism_First_Offender.pdf, Ex. 6 (last accessed June

25, 2019). For offenders with zero criminal points but with a conviction that does not "count," the recidivism rate ticks slightly upward to 2.9%. *Id.*

For all male offenders in Criminal History Category ("CHC") I, the recidivism rate is 15.2%. For those over age 50 at the time of sentencing, however, the rate in Category I is only 6.2%. For those who are college graduates, the rate in CHC I is just 7.1%; for those who have been employed, the rate is 12.7%; and for those who were ever married, the rate is 9.8%. For those with no history of illicit drug use, the recidivism rate is half that of those who do have a drug history. For those like Mr. Kachkar who are educated, have been employed, have been married, are drug free and over 50, the recidivism rate is certainly much lower. *See Measuring Recidivism*, at Exh. 9, at 28; Exh. 10, at 29.

For all Category I defendants convicted of fraud, the recidivism rate is just 9.3%, the lowest of any offense category, which is 45% below the rate for all fraud offenders. *Id.*, Exh. 11, at 30. Finally, offenders like Mr. Kachkar with zero criminal history points have a rate of recidivism half that of offenders with one criminal history point. *Id.* at 13-14. The Commission has recognized the advisability of revising the guidelines to take age and first offender status into account. *Id.* at 1-2 (identifying goal of "refin[ing] a workable 'first-offender' concept within the guideline criminal history structure"); *Measuring Recidivism* at 16 (noting that "[o]ffender age is a pertinent characteristic" that would "improve [the] predictive power of the guidelines "if incorporated into the criminal history computation"). The Commission has not implemented any such revisions to the criminal history

guidelines, but has recently stated that age "may be relevant" in granting a departure. USSG § 5H1.1, p.s. Recidivism studies therefore show that those in Mr. Kachkar's circumstance, those over fifty years of age and who find themselves in Criminal History Category I, have an especially low rate of recidivism.

Mr. Kachkar has been personally and financially devastated as a result of his conduct. There is no reason to believe that a sentence within the advisory guideline range is necessary to prevent him from committing further crimes. "The Commission did not find a strong correlation between the severity of the offender's federal offense conduct, as determined under the sentencing guidelines, and future recidivism. Under the guidelines, the seriousness of an offender's federal crime is measured by a final offense level score ranging from one to 43. There is not a strong correspondence between final offense level and recidivism." *See* U.S. Sentencing Commission, *Recidivism Among Federal Offenders: A Comprehensive Overview*, at p.20 (March 2016) (available at https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2016/recidivism_overview.pdf) (last accessed June 26, 2019).

## CONCLUSION

Mr. Kachkar already has served nearly 3 years in prison. A sentence within the advisory guideline range would be "greater than necessary" to serve the purposes of punishment. We respectfully request the Court to consider the foregoing in fashioning a just and appropriate sentence.[5]

Respectfully Submitted,

**MICHAEL CARUSO**
**FEDERAL PUBLIC DEFENDER**

By:   *Michael Caruso*
      Florida Bar No. 051993
      Michael_Caruso@fd.org

      *s/ Sowmya Bharathi*
      Florida Bar No. 81676
      150 West Flagler Street, Suite 1700
      Miami, Florida 33130-1556
      Tel. (305) 530-7000
      Sowmya_Bharathi@fd.org

## CERTIFICATE OF SERVICE

I HEREBY certify that on **June 27, 2019,** I electronically filed the foregoing document with the Clerk of the Court using CM/ECF.  I also certify that the foregoing document is being served this day on all counsel of record via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

By:   *s/ Sowmya Bharathi*

---

[5] Mr. Kachkar will request a Court order that he remain at the Federal Detention Center Miami during the pendency of his appeal to assist counsel.